Steven J. Reisman, Esq.
Jerry L. Hall, Esq. (admitted *pro hac vice*)
Cindi M. Giglio, Esq.
**KATTEN MUCHIN ROSENMAN LLP**
575 Madison Avenue
New York, NY 10022
Telephone:     (212) 940-8800
Facsimile:     (212) 940-8876
sreisman@kattenlaw.com
jerry.hall@kattenlaw.com
cindi.giglio@kattenlaw.com

Peter A. Siddiqui, Esq. (admitted *pro hac vice*)
**KATTEN MUCHIN ROSENMAN LLP**
525 W. Monroe Street
Chicago, IL 60661
Telephone:     (312) 902-5455
Facsimile:     (312) 902-1061
peter.siddiqui@kattenlaw.com

*Proposed Counsel to Debtors and Debtors-in-Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| SIZMEK INC., *et al.*,[1] | Case No. 19-10971 (SMB) |
| Debtors. | (Jointly Administered) |

**DEBTORS' MOTION FOR AN ORDER AUTHORIZING AND APPROVING A PRIVATE SALE OF THE DEMAND SIDE PLATFORM AND THE DATA MANAGEMENT PLATFORM FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS, AND GRANTING RELATED RELIEF**

Sizmek Inc. and certain of its affiliates, the debtors and debtors in possession in the above-captioned cases (collectively, the "Debtors") hereby move (the "Sale Motion")[2] this Court

---

[1]    Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Sizmek Inc. (4624); Sizmek DSP, Inc. (2319); Point Roll, Inc. (3173); Sizmek Technologies, Inc. (6402); Wireless Artist LLC (0302); Wireless Developer, Inc. (9686); X Plus One Solutions, Inc. (8106); and X Plus Two Solutions, LLC (4914). The location of Debtors' service address for purposes of these chapter 11 cases is: 401 Park Avenue South, Fifth Floor, New York, NY 10016.

[2]    A detailed description of Debtors and their businesses, and the facts and circumstances supporting Debtors' chapter 11 cases, are set forth in in the *Declaration of Sascha Wittler, Chief Financial Officer of Sizmek Inc., (I) in Support of Chapter 11 Petitions and First Day Pleadings, and (II) Pursuant to Local Rule 1007-2* [Dkt. 13], filed on April 2, 2019, and the *Supplemental Declaration of Sascha Wittler, Chief Financial Officer of Sizmek Inc., (I) in Support of Chapter 11 Petitions and First Day Pleadings, and (II) Pursuant to Local Rule 1007-2* [Dkt. 58], filed on April 9, 2019 (together, the "First Day Declaration").

pursuant to Sections 105, 363, and 365 of Title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 6004, 6006, 9007, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 6004-1 and 6006-1 of the Local Rules (the "Local Bankruptcy Rules") for the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") for entry of an order (the "Sale Order"), substantially in the form attached as Exhibit A, authorizing and approving, (i) Sellers' entry into the Asset Purchase Agreement,[3] attached to the Sale Order as Exhibit 1, (ii) authorizing the Sellers to pay a break-up fee and expense reimbursement to the Buyer, under certain conditions set forth in the APA; and (iii) the sale of the Purchased Assets (defined in the Asset Purchase Agreement) free and clear of all liens, claims, interests, and encumbrances (collectively, the "Liens").  Such Liens will attach to the proceeds received by Debtors from such sale with the same validity, extent, and priority as had attached to the Purchased Assets immediately prior to the sale.

In support of the Sale Motion, Debtors rely upon and incorporate by reference the First Day Declaration (defined below), the Declaration of Glenn Tobias in Support of the Sale Motion (the "FTI Declaration"), and the Declaration of Sascha Wittler, Chief Financial Officer of Sizmek Inc., in Support of the Sale Motion (the "Company Declaration"), each filed herewith.  In further support of the Sale Motion, Debtors, by their undersigned counsel, respectfully represent:

---

[3]    That certain asset purchase agreement, between the Sellers and Zeta Global Holdings Corp., a Delaware corporation (or one of its direct or indirect subsidiaries) (the "Buyer"), dated as of April 18, 2019 (the "Asset Purchase Agreement" or the "APA"), attached to the Sale Order as Exhibit 1.  The APA contemplates that the Buyer has an option to purchase certain assets owned by certain of the Debtors' Non-Debtor wholly owned subsidiaries.  The Debtors will work with the Buyer to help facilitate these sales, pursuant to the terms of the APA.  For the avoidance of doubt, this Sale Motion does not seek any relief regarding the sale of any Non-Debtor assets.

2

## JURISDICTION AND VENUE

1.      This Court has jurisdiction to consider this Sale Motion under 28 U.S.C. §§ 157 and 1334.  This is a core proceeding under 28 U.S.C. § 157(b).  Venue of these cases and this Sale Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

2.      The relief requested herein is proper under Bankruptcy Code Sections 105, 363, and 365, Bankruptcy Rules 2002, 6004, 6006, 9007, and 9014, Local Bankruptcy Rules 6004-1 and 6006-1, and the Guidelines for the Conduct of Assets Sales promulgated by General Order M-383 of the Bankruptcy Court (the "Sale Guidelines").

## BACKGROUND

3.      Sizmek Inc., together with its Debtor and non-Debtor affiliates, is a leading online advertising campaign management and distribution platform for advertisers, media agencies, and publishers.  As of the Petition Date (defined below), Debtors and their non-Debtor affiliates, had approximately 1,114 employees worldwide.  Debtors and their non-Debtor affiliates assist their clients with engaging a broad consumer audience in 19 countries across multiple online media channels by facilitating the implementation of targeted, data-driven advertising strategies that encompass all of the technology and intelligence necessary to execute effective global advertisement campaigns.  Debtors are headquartered in New York, New York, with operations and assets in the United States and abroad.  As of the Petition Date, Debtors have approximately $172 million of funded indebtedness.

## A.      The Chapter 11 Cases

4.      On March 29, 2019, (the "Petition Date") each of Debtors filed a voluntary petition for relief (the "Chapter 11 Cases") under chapter 11 of the Bankruptcy Code.  Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to Sections

1107(a) and 1108.[4]  As of this filing, the Office of the United States Trustee for the Southern

District of New York (the "U.S. Trustee") has appointed an official committee of unsecured

creditors ("Committee") in these Chapter 11 Cases.  Additional information regarding Debtors'

business, their capital structure, and the circumstances leading to these chapter 11 filings is

contained in the First Day Declaration.

**B.      The Demand-Side Platform and Data Management Platform**

5.      Debtors' media business consists of running a platform that enables advertisers and

their agencies to buy advertising placements on millions of websites across the globe.  This

platform is called a Demand Side Platform ("DSP").  The DSP allows advertisers or agencies to

buy digital media in an automated fashion and assists in determining which ads should be delivered

to which individual consumers.  Within their media business, Debtors have two business models—

a "Managed Service Business," in which Debtors buy advertising slots or inventory across web

pages, apply data and services, and sell the inventory at a higher price point, and a "Self-Service

Platform," in which Debtors provide clients access to the platform to conduct such transactions

themselves in return for a fee.

6.      As part of their data business segment, Debtors run a Data Management Platform

("DMP") that processes non-identifiable information for the purpose of developing audience

segments for targeted advertising, and also optimizes that advertising and content displayed on

individual sites.

7.      The DSP and the DMP are interdependent.  The DSP and DMP work off of each

other, with the DMP determining which audiences advertisements are best suited for, and the DSP

identifying where those advertisements should be placed, in order to most effectively reach the

---

[4] Unless otherwise provided, "Section" references are to the Bankruptcy Code.

target audiences.  Because of this interdependence, almost all parties have expressed an interest in purchasing the DSP or DMP together.  Similarly, the integrated nature of the DSP and DMP means that the value of the DSP and DMP together is likely greater than the value of the DSP and DMP individually, meaning that selling the DSP and DMP together is the best way to maximize the value of the DSP and DMP.

8.      Starting almost immediately after the Petition Date, advertising inventory supply into the DSP has been declining precipitously.  The supply vendors have withdrawn from flowing supply into Debtors' supply to such an extent that Debtors are not able to participate in the essential programmatic auction process that is the starting point for the eligibility to place advertisements on websites.  Presently, very few vendors transact with Debtors to support Debtors' participation in the programmatic advertising auction process.  That being the case, the DSP customers have started to migrate to other providers (Debtors' DSP product competitors) to support their advertising requirements.  In effect, the DSP is moving toward a dry state of being short of threshold levels of advertising to support customer's advertising inventory needs.  Under this state, the DSP is meaningfully loss making, and if this continues, the DSP will quickly need to shut down as it cannot sustain further uneconomic performance.  If so, the DSP is essentially shutting down.

9.      As a result, Debtors must sell the DSP on an urgent, expedited basis to avoid the complete collapse of the DSP going concern value.  If the DSP is shut down or operating at just a fraction of its normal level, for too much longer, measured in days not weeks, advertising customers who are no longer able to place advertising through the DSP will have no choice but to transition wholesale to other providers.  Once advertiser customers complete the transition, the revenue from such advertisers that shifts away from the DSP is not likely temporary.  As such, the

DSP will soon lose its value as a going concern.  On the other hand, if the DSP is purchased and business resumes promptly, Debtors' DSP customer base will remain largely intact and the business will be able to continue as a going concern, enhancing the likelihood that the employees who work on the DSP will continue to be employed.

10.    The value of the DMP is not disintegrating in the same way as the value of the DSP, however, Debtors are also seeking urgent relief to sell the DMP, as selling the DSP and DMP together is likely the best way to maximize the value of the assets.  While time will not cause the value of the DMP to diminish, a stand-alone sale of the DSP certainly will.

## C.    The Sellers

11.    The proposed sale of the Purchased Assets contemplated by the APA (the "Sale Transaction") contemplates the sale of assets of the following Debtors:  Sizmek DSP, Inc.; X Plus Two Solutions, LLC; X Plus One Solutions, Inc.; Wireless Developer, Inc.; and Wireless Artist LLC (the "Sellers").  *See* APA, Preamble.

## D.    Debtors' Marketing and Sales Efforts

12.    Debtors believe, in their business judgement, the Sale Transaction represents the only available means to preserve and maximize value, viability and continuation of the DSP as a going concern.  It is essential to the value of the DSP that all supply sources for the DSP remain functional and delivering at the standard operational sale.  Due to Debtors' cash constraints, Debtors lack the liquidity necessary to pay all vendors to keep the DSP functional and delivering at the standard operational scale.  Therefore, Debtors, in their business judgment, believe that the best, and only, option is to sell the DSP as soon as possible, or risk the DSP losing going concern value, including the prospect of continued employment for current DSP employees.

13.    To that end, Debtors, along with their advisors, including FTI, have undertaken a concentrated effort to market the DSP, engage potential buyers, and reach an agreement on a sale

138548939_392525-00001

as quickly and efficiently as possible, while still ensuring that the sale is in the best interests of Debtors estates and maximizes the value of the Purchased Assets.

14.     In connection with these efforts, FTI has spoken to dozens of interested parties, which resulted in forty-one (41) of those parties executing NDAs with Debtors to conduct further diligence (the "Interested Parties").  Over thirty (30) of the Interested Parties accessed the data room set up by Debtors and their advisors with diligence on the DSP and DMP.  By April 3, 2019, Debtors received their first letter of interest from a buyer interested in purchasing the DSP and DMP.  Debtors received an additional letter of interest on April 5, 2019.

15.     As a result of Debtors' marketing and sales process, which was appropriate in Debtors' business judgement, in consultation with their experienced professional advisors, given the circumstances, and the arm's-length negotiations among the parties, the sale of the Purchased Assets to the Buyer will maximize the value of Debtors' estates for the benefit of all their creditors, their stakeholders, and other parties in interest.

16.     Moreover, the Buyer intends to continue the business and intends to offer employment to many of the current employees of the DSP business unit.

17.     The APA also contemplates certain bidding protections for the Buyer.  Specifically, if Sellers consummate a sale of the Purchases Assets to a purchaser other than the Buyer, the Sellers will be entitled to: (1) a breakup fee of $250,000; and (2) expense reimbursement up to a maximum of $500,000 (together, the "Bid Protections").  As referenced above, the Debtors received multiple offers for the Purchased Assets.  The Sale Transaction contemplated by the APA is, in the Debtors' business judgement, in consultation with their advisors the best option to maximize value of Debtors' estates.  Nonetheless, the Debtors recognize that there is a possibility they could receive additional offers in the future to purchase the Purchased Assets.  Therefore, the

7

Debtors are maintaining a fiduciary-out to consider higher and better offers for the Purchased Assets.  Due to the time and resources the Buyer has already invested into the Sale Transaction, and the additional time and resources the Buyer plans to invest between now and the Closing, the Buyer insisted upon and the Debtors agreed to provide the Bid Protections.

## RELIEF REQUESTED

18.     By this Sale Motion, Debtors seek entry of the Sale Order approving the sale of Purchased Assets, the assumption and assignment of certain of Sellers' executory contracts and unexpired leases, and grant related relief.

19.     For the reasons below, Debtors submit that the relief requested herein is in the best interest of Sellers, their estates, creditors, stakeholders, and other parties in interest, and therefore, should be granted.

## BASIS FOR RELIEF

**A.    Sound Business Purpose**

20.     Debtors have a sound business justification for consummating the Sale Transaction. Debtors seek to maximize the value of their estates for the benefit of their creditors and other stakeholders.  To that end, Debtors have secured an offer from the Buyer for the Purchased Assets.

21.     Specifically, the total sale price contemplated by the APA is approximately $33-$36 million, consisting of (1) $10,000,000 in cash, payable on Closing; (2) $5,000,000 in preferred equity; and (3) a share of the future collections on accounts receivable, specifically, (a) 50% of the first $10,000,000; (b) 70% of the second $10,000,000; and (c) 60% of all remaining collections.

**B.    Summary of Certain Terms of the APA**

22.     After arm's-length negotiations, the Sellers and the Buyer executed the APA.  The APA was negotiated, proposed, and entered into by the Sellers and the Buyer without collusion,

8

in good faith, and from arm's-length bargaining positions.  The Sellers, the Buyer, and all other

relevant parties were represented by practical and experienced advisors and attorneys.

23.     A summary of the principal terms of the APA is as follows:[5]

- **Purchase Price and Sale of Purchased Assets**.  The Purchase Price totals approximately $33-$36 million, consisting of (1) $10,000,000 in cash, payable on Closing; (2) $5,000,000 in preferred equity; and (3) a share of the future collections on accounts receivable, specifically, (a) 50% of the first $10,000,000; (b) 70% of the second $10,000,000; and (c) 60% of all remaining collections (items (a) – (c), together, the "Subsequent Payments").

- **Sellers**.  SIZMEK DSP INC., a Delaware corporation f/k/a Rocket Fuel Inc., X Plus Two Solutions, LLC, a Delaware limited liability company, X Plus One Solutions, Inc., a Delaware corporation, WirelessDeveloper, Inc., a Michigan corporation, Wireless Artist LLC, a Michigan limited liability company

- **Purchased Assets**.  All of each Seller's right and title to and interest in and to the assets, properties, and rights (contractual or otherwise) owned by such Seller, in each case, which primarily relate to, or are primarily used or held for use, in connection with the Sellers' business of internet advertising and related managed services under the demand side platform and the data management platform.

## C.     Extraordinary Provisions Under the Sale Guidelines

24.     The proposed Sale Order and the APA contain the following items that may be

considered Extraordinary Provisions under the Sale Guidelines:[6]

- **Private Sale/No Competitive Bidding**: The sale of the Purchased Assets pursuant to the APA does not contemplate an auction or other further competitive bidding process.  As described below and in the FTI Declaration and the Company Declaration, an expedited sale of the Purchased Assets to the Buyer provides the best opportunity to maximize value, particularly given the marketing process.  The delay resulting from an auction or further bidding

---

[5]   This summary is qualified in its entirety by reference to the provisions of the APA.  In the event of inconsistencies between the provisions of the APA and this summary, the terms of the APA shall govern.  Capitalized terms used in this Section B of the Sale Motion and not otherwise defined shall have the meanings given them in the APA.

[6]   The following list of possible Extraordinary Provisions, as defined in the Sale Guidelines, is not an admission that any of these items are unusual relief in a sale of significant assets of a large chapter 11 debtor pursuant to Section 363.  Inapplicable Extraordinary Provisions have not been included in the following list.  This summary of Extraordinary Provisions is qualified in its entirety by reference to the provisions of the APA.  In the event of inconsistencies between the provisions of the APA and this summary, the terms of the APA shall govern.  Capitalized terms used in this Section C of the Sale Motion and not otherwise defined shall have the meanings given them in the APA.

process would result in significant value degradation and the failure to achieve a higher or better offer for the Purchased Assets from any other potential purchaser, and the likely loss of Buyer's offer.

- **Purchase Price Adjustments**:  If Sellers have paid any of the Assumed Liabilities on or after April 30, 2019 and prior to the Closing Date, then the Closing Cash Payment shall be increased dollar for dollar in the amount of any such payment; provided, however, that without the consent of Purchaser (which shall not be unreasonably withheld), Sellers shall not pay any such Assumed Liabilities which are commissions or other obligations which are not yet due and payable.  *See* APA, § 2.3.

- **Deadlines that Effectively Limit Notice**: The Sale Transaction may be terminated if the Bankruptcy Court shall not have entered the Sale Order, in form and substance reasonably acceptable to Buyer, on or prior to April 30, 2019, or such order shall have been stayed, vacated, reversed, modified or amended at any time in any respect without the prior written consent of Buyer given in its sole discretion.  *See* APA, § 12.2(f).

- **Interim Arrangements with Proposed Buyer**: The Buyer and the Sellers are planning to enter into a transition services agreement to facilitate the smooth transition of the Purchased Assets to the Buyer.  Sellers shall provide to Buyer certain transition services as mutually agreed upon by Sellers and Buyer on or prior to Closing, including technology infrastructure, software and other services required to manage and operate the Business as presently conducted for a fee equal to one hundred and ten percent (110%) of cost to Sellers; provided that, Sellers shall only provide such transition services so long as they are in existence and are able to, and own the assets necessary to, provide such services.  *See* APA, § 9.9(b).

- **Use of Proceeds**:  The Sale Order provides that, in connection with the closing of the Sale Transaction, the Buyer is authorized and directed to pay directly (the "Direct Cerberus Payments") to Cerberus Business Finance, LLC ("Cerberus"), as administrative agent and collateral agent for certain revolver and term loan lenders (the "Senior Lenders" and, together with Cerberus, the "Secured Parties") under that certain *Financing Agreement*, dated as of September 6, 2017 (as subsequently amended from time to time, the "Financing Agreement"), all amounts that are payable by the Buyer at closing (whether in the form of cash or otherwise) and fifty percent (50%) of the Subsequent Payments, namely all amounts that may subsequently become payable by the Buyer under the APA or under any related documents.  The Sale Order further provides that Cerberus is authorized to apply the Direct Cerberus Payments to satisfy amounts owed to the Secured Parties under the Financing Agreement in accordance with the terms and conditions thereof.  The Sale Order makes clear, however, that the authority for Cerberus to receive and apply the Direct Cerberus Payments under the Sale Order will not restrict the relief that might be sought by any party in interest against the Secured Parties pursuant to the

10

terms and conditions of the *Interim Order (I) Authorizing the Debtors to Use Cash Collateral Pursuant to 11 U.S.C. § 363, and (II) Granting Adequate Protection Pursuant to 11 U.S.C. §§ 361, 362, 363, and 507, and Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001(b)* [Dkt. 37] or any successor order thereto (such order as may be in effect at a given time, the "Cash Collateral Order"), as to which possible relief the rights of all parties (including the Secured Parties) are fully reserved.

- **Bid Protections**:  As described above and in more detail in the APA, the Buyer will be entitled return of 50% its deposit Closing is not consummated by April 30, 2019, and 100% of its deposit if Closing is not consummated by May 15, 2019.  In addition, if Sellers consummate a sale of the Purchases Assets to a purchaser other than the Buyer, the Sellers will be entitled to the Bid Protections, namely: (i) a breakup fee of $250,000; and (ii) expense reimbursement up to a maximum of $500,000.

- **Record Retention**: Neither Buyer nor Sellers shall dispose of any business records and files relating to any Purchased Asset for a period of seven years following the Closing Date (unless, in the case of Buyer, it first offers to surrender such records and files to Sellers).  Each Party shall also allow the other Parties reasonable access to such files and records for reasonable business purposes, including purposes related to the Chapter 11 Cases.

- **Requested Findings as to Successor Liability**: Debtors seek findings that the Buyer is not a successor to Sellers or their estates and the Sale does not amount to a consolidation, merger or de facto merger of the Buyer and Sellers.  *See* Sale Order ¶ N.

- **Requested Findings as to Fraudulent Conveyance**: The proposed Sale Order requests findings that none of Sellers or the Buyer has entered into the APA or proposes to consummate the Sale, for the purpose of hindering, delaying, or defrauding the Sellers' present or future creditors or otherwise in violation of applicable fraudulent conveyance and fraudulent transfer laws.  *See* Sale Order ¶ L, M.

- **Relief from Bankruptcy Rule 6004(h), 6006(d), and 6006(f) and relief under 6006(e)**: Debtors seek relief from the fourteen-day stay imposed by Bankruptcy Rule 6004(h) and 6006(d) and relief from the requirement of 6006(f) that a motion to assume multiple executory contracts or unexpired leases that are not between the same parties be limited to no more than 100 executory contracts or unexpired leases (to the extent this provision is implicated).  Moreover, Debtors seek authority to proceed under 6006(e)(3), such that this Court authorizes the Sale Motion to apply to multiple contracts.

11

## APPLICABLE AUTHORITY

25.     The Section 363(b) standard for sales outside of the ordinary course of a debtor's business is met here.  Section 363(b) provides, in relevant part:  "The trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  This Court's power under Section 363 is supplemented by Section 105(a), which provides in relevant part:  "The Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).  As set forth below, Debtors have satisfied the requirements of Sections 105, 363, and 365 as those Sections have been construed by courts in the Second Circuit.

### A.     Approval of the Sale Transaction Is Warranted under Section 363(b) Because a Sound Business Reason Exists for the Sale Transaction.

26.     Bankruptcy Rule 6004(f)(1) explicitly permits a debtor to enter into transactions outside of the ordinary course of business through private sales.  As discussed above, the sale to the Buyer provides Debtors with the best — and only executable — opportunity to maximize the sale price of the Purchased Assets and prevent a total loss of going concern value associated with delay.  Courts in this District have approved private sales in accordance with General Order M-383 where the benefit of the private sale outweighs the delay and expense of conducting a public auction.  *See In re SunEdison, Inc.*, Case No. 16-10992 (SMB) (Bankr. S.D.N.Y. Aug. 16, 2016) [Dkt. 1002]; *In re Hawker Beechcraft, Inc.*, Case No. 12-11873 (SMB) (Bankr. S.D.N.Y. Nov. 29, 2012) [Dkt. 857] (authorizing private sale under Rule 6004(f)(1) where public auction's substantial additional costs would result in no additional value to the estate); *In re Dewey & Leboeuf LLP*, Case No. 12-12321 (MG) (Bankr. S.D.N.Y. Nov. 1, 2012) [Dkt. 608] (finding good business reason to sell assets pursuant to private sale where public sale would be more costly); *In re Chemtura Corp.*, Case No. 09-11233 (REG) (Bankr. S.D.N.Y. July 23, 2010) [Dkt. 3366]

12

(approving private sale of debtor's business); *In re Sonix Med. Res. Inc.*, Case No. 09-77781 (DTE) (Bankr. E.D.N.Y. March 19, 2010) [Dkt. 287] (authorizing private sale of debtors' assets and approving asset purchase agreement as best opportunity to avoid substantial risk that asset values would deteriorate if sale was not consummated); *see also Palermo v. Pritam Realty, Inc. (In re Pritam Reality, Inc.)*, 233 B.R. 619 (D.P.R. 1999) (upholding bankruptcy court order approving private sale by debtor).[7] Completing the sale of the Purchased Assets to the Buyer pursuant to the APA is:  (i) an exercise of Debtors' sound business judgment; (ii) permitted by the Bankruptcy Code and Bankruptcy Rules; and (iii) in the best interests of Debtors' estates and creditors.

27.    The use, sale, or lease of property of the estate, other than in the ordinary course of business, is authorized when there is an "articulated business justification" for the action to be taken.  *See Fulton State Bank v. Schipper (In re Schipper)*, 933 F.2d 513, 515 (7th Cir. 1991) (citation omitted).  When a valid business justification exists, the law vests the debtor's decision to use property out of the ordinary course of business with a strong presumption that "'in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company.'"  *See Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (citation omitted).

28.    Furthermore, Section 363(b) applies to private sales consummated in the absence of competitive bidding.  *See, e.g., In re Wieboldt Stores, Inc.*, 92 B.R. 309, 312 (N.D. Ill. 1988) ("Section 363(b) is not limited to sales involving competitive bidding.  Bankruptcy Rule 6004, which sets forth procedures for Section 363(b) transfers, expressly provides for private sales.").

---

[7]    Due to the voluminous nature of the orders cited herein, they are not attached to this Sale Motion.  Copies of these orders, however, are available on request.

In this District, General Order M-383 requires a debtor moving to sell assets in the absence of an auction (or not otherwise seeking higher or better offers) to explain why such sale is likely to maximize the sale price. Amended Guidelines for the Conduct of Asset Sales, General Order M-383, 1.D.3 ("General Order M-383").

29.    Debtors' business justification for entering into the Sale Transaction is clear. Debtors and their advisors participated in arms-length negotiations with the Buyer in the forming of the APA and the Sale Transaction. The sale price is fair and reasonable under the circumstances. Moreover, both Debtors and the Buyer were represented by practical and experienced advisors and attorneys in negotiating the APA. Accordingly, it is a valid exercise of Debtors' business judgment to seek the relief requested by this Sale Motion.

**B.    The Bid Protections Should Be Approved.**

30.    Bankruptcy Courts have approved protections similar to the Bid Protections under the "business judgment rule," and such arrangements are presumptively valid provided: (i) the debtors' decision to agree to a break-up fee is not tainted by bad faith or self-dealing; (ii) the break-up fee does not hamper bidding; and (iii) the amount of the break-up fee is reasonable. *See Official Comm. Of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656-57 (S.D.N.Y. 1992), appeal dismissed, 3 F.3d 49 (2d Cir. 1993). Specifically, such provisions (i) attract or retain a potentially successful bid; (ii) establish a bid standard or minimum for other bidders to follow; and (iii) attract additional bidders. *Id.* at 662.

138548939_392525-00001

31.     The Bid Protections are reasonable in relation to the size of the proposed Sale and under the facts of this transaction.  The break-up fee is less than 1% of the total Purchase Price.[8] Combined, the Bid Protections are only 2% of the total Purchase Price.

32.     The Bid Protections do not hamper any other party's ability to offer a higher or better bid for the Purchased Assets.  Given the size of the Bid Protections relative to the total amount of consideration provided for the Purchased Assets, the Bid Protections are not so large as to have a "chilling effect" on other prospective bidders' interest in the Purchased Assets.

33.     Furthermore, because the timely sale of the Purchased Assets is necessary to preserve the value, the Bid Protections constitute an actual and necessary cost and expense of preserving the Debtors' estates.  Accordingly, the Debtors submit the Bid Protections are appropriate.

**C.      The Proposed Sale Transaction Satisfies the Requirements of Section 363(f) for a Sale Free and Clear**

34.     Section 363(f) permits a debtor to sell property free and clear of another party's interest in the property if:  (a) applicable non-bankruptcy law permits such a free and clear sale; (b) the holder of the interest consents; (c) the interest is a lien and the sale price of the property exceeds the value of all liens on the property; (d) the interest is in bona fide dispute; or (e) the holder of the interest could be compelled in a legal or equitable proceeding to accept a monetary satisfaction of its interest. *See* 11 U.S.C. § 363(f).  Satisfying any of Section 363(f)'s five requirements warrants approval of the proposed sale.  *See Scherer v. Fed. Nat'l Mortg. Ass'n (In re Terrace Chalet Apartments, Ltd.)*, 159 B.R. 821, 825 (N.D. Ill. 1993) (sale extinguishes liens under Section 363(f) as long as one specified exception applies).

---

[8]     The Purchase Price is a range, dependent on the total amount of Accounts Receivable collected.  For purposes of this calculation, percentage is based on a Purchase Price of $33 million.

138548939_392525-00001

35.     The sale of the Purchased Assets to the Buyer pursuant to the APA is appropriate under Section 363(f).  If a lien holder does not object to the proposed Sale Transaction, that entity should be deemed to have consented to the Sale Transaction, thereby satisfying Section 363(f)(2).  Any entity holding Liens on the Purchased Assets, including counsel for Cerberus, will receive notice of this Sale Motion and the Sale Hearing.  Accordingly, all parties in interest may object to the relief requested herein – failure to do so is consent.  *See Futuresource LLC v. Reuters Ltd.*, 312 F.3d 281, 285-86 (7th Cir. 2002) ("It is true that the Bankruptcy Code limits the conditions under which an interest can be extinguished by a bankruptcy sale, but one of those conditions is the consent of the interest holder, and lack of objection (provided of course there is notice) counts as consent.  It could not be otherwise; transaction costs would be prohibitive if everyone who might have an interest in the bankrupt's assets had to execute a formal consent before they could be sold." (internal citations omitted)).

36.     Further, any party with an interest in the Purchased Assets pursuant to this Sale Motion shall have a corresponding security interest in the proceeds of the Sale Transaction received by Debtors (subject to Debtors' claims, defenses and objections with respect to the amount, validity, or priority of each such interest).  *See MacArthur Co. v. Johns-Manville Corp.*, 837 F.2d 89, 94 (2d Cir. 1988) ("It has long been recognized that when a debtor's assets are disposed of free and clear of third-party interests, the third party is adequately protected if his interest is assertable against the proceeds of the disposition.").  Therefore, any lien holders are adequately protected and could be compelled to accept a monetary satisfaction of their interest.  As such, the requirements of Section 363(f) would be satisfied for a sale of the Purchased Assets free and clear of all Liens.

138548939_392525-00001

37.     Similarly, it is appropriate to sell the Purchased Assets free and clear of successor liability relating to Sellers' businesses and Purchased Assets.  Such limitations on successor liability ensure that the Buyer is protected from any claims or lawsuits against the Buyer as a successor in interest to one or more of Debtors' estates, or any subsidiaries of the Debtors.  If such relief is not granted, the purpose of an order purporting to authorize the transfer of assets free and clear of Liens would be frustrated by the potential for claimants to thereafter use the transfer as a basis to assert claims against a purchaser arising from a Seller's pre-sale conduct.

38.     A buyer of a debtor's assets pursuant to a Section 363 sale takes free and clear from successor liability relating to the debtor's business.  *See, e.g., In re Chrysler LLC*, 405 B.R. 84, 111 (Bankr. S.D.N.Y. 2009) ("[I]n personam claims, including any potential state successor or transferee liability claims against New Chrysler, as well as in rem interests, are encompassed by Section 363(f) and are therefore extinguished by the Sale Transaction."); *Contrarian Funds, LLC v. Westpoint Stevens, Inc. (In re Westpoint Stevens, Inc.)*, 333 B.R. 30, 50 (S.D.N.Y. 2005) ("Where . . . a sale is to be free and clear of existing liens and interests other than those of the estate, one or more of the criteria specified in Section 363(f) of the statute must also be met."), *rev'd in part on other grounds*, 600 F.3d 231 (2d Cir. 2010).

39.     Moreover, this Court's authority under Section 363 is supplemented by Section 105(a), which provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a); *see* 2 Collier on Bankr. ¶ 105.01 (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2016); *see also Croton River Club, Inc. v. Half Moon Bay Homeowners Ass'n (In re Croton River Club, Inc.)*, 52 F.3d 41, 45 (2d Cir. 1995) (holding that bankruptcy courts have broad equity power to manage the affairs of debtors); *Momentum Mfg. Corp. v. Employee Creditors Comm. (In re Momentum Mfg.*

17

*Corp.*), 25 F.3d 1132, 1136 (2d Cir. 1994) ("[B]ankruptcy courts are courts of equity, empowered to invoke equitable principles to achieve fairness and justice in the reorganization process."); *Volvo White Truck Corp. v. Chambersburg Beverage, Inc. (In re White Motor Credit Corp.)*, 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987) ("Authority to conduct such sales [free and clear of claims] is within the court's equitable powers when necessary to carry out the provisions of Title 11.").

40.    For these reasons, the Court should permit the Sale Transaction free and clear of Liens and successor liability.

**D.    Payment of Proceeds to Cerberus is Appropriate.**

41.    The Sale Order contemplates that the Buyer will pay the Direct Cerberus Payments directly to Cerberus and that Cerberus may apply such payments to satisfy amounts owed to the Secured Parties under the Financing Agreement in accordance with the terms and conditions thereof.  This relief is appropriate for several reasons.  First, the sale proceeds are proceeds of collateral on which Cerberus has perfected security interests, both as a result of its prepetition liens and on a postpetition basis pursuant to the Cash Collateral Order.  *See* Cash Collateral Order ¶¶ 5(a), 6(a) & 7(a).  Second, payment of the Direct Cerberus Payments to Cerberus is a precondition to Cerberus' consent to sale of its collateral, without which consent Cerberus contends that the Debtors Sellers' Purchased Assets could not be sold on a free-and-clear basis under Bankruptcy Code Section 363(f).  Third, such payments and application is not prejudicial to the Debtors' estates because (i) Debtors have reason to believe that the fifty percent (50%) of the Subsequent Payments will be adequate, considering all available assets, to pay all administrative expenses due or accruing during the Chapter 11 Cases; (ii) Debtors have other operations that are expected to generate separate cash that will be available for use in accordance with the terms and conditions of the Cash Collateral Order and (iii) all parties' rights are fully reserved with regard to the

18

remedies that might be sought against the Secured Parties in accordance with the terms and conditions of the Cash Collateral Order.

**E.      The Buyer Should be Entitled to the Protections of Section 363(m).**

42.      Section 363(m) provides in relevant part that the reversal or modification on appeal of an authorization under Section 363(b) of a sale or lease of property does not affect the validity of such a sale or lease to a purchaser who bought or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal. *See* 11 U.S.C. § 363(m).  "Although the Bankruptcy Code does not define the meaning of 'good-faith purchaser,' . . . most courts have adopted a traditional equitable definition: 'one who purchases the assets for value, in good faith and without notice of adverse claims.'" *Licensing by Paolo, Inc. v. Sinatra (In re Gucci)*, 126 F.3d 380 (2d Cir. 1997) (citation omitted).  The Third Circuit has held: "'[t]he requirement that a purchaser act in good faith . . . speaks to the integrity of [purchaser's] conduct in the course of the sale proceedings.'" *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 147 (3d Cir. 1986) (citation omitted).  A purchaser's good faith status involves "'fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.'" *Hoese Corp. v. Vetter Corp. (In re Vetter Corp.)*, 724 F.2d 52, 56 (7th Cir. 1983) (quoting *In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978) (interpreting Bankruptcy Rule 805, the precursor to Section 363(m))).  In addition, Section 363(m) protection applies in the context of private sales. *See In re Wieboldt Stores, Inc.*, 92 B.R. at 312.  The sale of the Purchased Assets is an arm's-length transaction entitled to the protections of Section 363(m), negotiated by sophisticated and unrelated parties with their own legal and other advisors.

**F.      Assumption and Assignment of Executory Contracts and Unexpired Leases Should Be Authorized Pursuant to a Subsequent Order of the Court**

43.      Section 365(a) provides that a debtor in possession "subject to the court's approval, may assume or reject any executory contract or [unexpired] lease of the debtor."  11 U.S.C. § 365(a).  Approval of a debtor's decision to assume or reject an executory contract or unexpired lease is appropriate when the debtor's reasonable business judgment supports assumption or rejection.  *See, e.g., Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)*, 4 F.3d 1095, 1098 (2d Cir. 1993) (noting that Section 365 "permits the trustee or debtor-in-possession, subject to the approval of the bankruptcy court, to go through the inventory of executory contracts of the debtor and decide whether ones it would be beneficial to adhere to and which ones it would be beneficial to reject").

44.      The business judgment test "requires only that the trustee [or debtor in possession] demonstrate that [assumption] or rejection of the contract will benefit the estate." *Wheeling-Pittsburgh Steel Corp. v. West Penn Power Co., (In re Wheeling-Pittsburgh Steel Corp.)*, 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987).  More exacting scrutiny would slow the administration of a debtor's estate and increase costs, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially. *See Richmond Leasing Co. v. Capital Bank*, 762 F.2d 1303, 1311 (5th Cir. 1985).  Moreover, to assume an executory contract, a debtor must "cure, or provide adequate assurance that the debtor will promptly cure," any default.  11 U.S.C. § 365(b)(1).

45.      A debtor may assign a contract it has assumed. 11 U.S.C. § 365(f)(2) (providing that the "trustee may assign an executory contract…only if the trustee assumes such contract…and adequate assurance of future performance is provided.").   "Adequate assurance of future performance" is fact and circumstance dependent.  Adequate assurance may be provided by

138548939_392525-00001

demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *See, e.g., In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (finding adequate assurance is present when prospective assignee has financial resources and is willing to devote sufficient funding to business to give it strong likelihood of success).

46.    Debtors request approval under Section 365 of Debtors' assumption and assignment of the Assigned Contracts to which a Debtor is a party to the Buyer or its Buyer Designee. Given the expedited time frame for consideration of this Sale Motion, Debtors do not seek approval of assumption and assignment of the Assigned Contracts at this time. Rather, Debtors seek approval for the assumption and assignment at a hearing to be scheduled approximately twenty-one (21) days following the service of a notice to all counterparties to Sellers' Assigned Contracts (the "Cure Notice") substantially in the form attached to the Sale Order as Exhibit 2. Debtors further request that the Court enter an assumption and assignment order (the "Assumption and Assignment Order"), providing that Sellers' Assigned Contracts will be transferred to, and remain in full force and effect for the benefit of, the Buyer or its Buyer Designee notwithstanding any provisions prohibiting assignment.

47.    To the extent necessary, Debtors will present facts at the hearing on the Assumption and Assignment Order to show the financial wherewithal, willingness, and ability of the Buyer or the Buyer Designee to perform under the Assigned Contracts.

48.    As mentioned above, Debtors will provide contractual counterparties with a Cure Notice which will include the amounts Debtors believe are necessary to cure any defaults in accordance with Section 365(b). Upon the payment of Cure Amounts, neither Sellers nor the Buyer shall have any further liabilities to the counterparties to the Assigned Contracts that accrue and become due and payable on or after the Closing Date except as provided in the APA. Upon

21

assuming an Assigned Contract and the payment of any relevant Cure Amounts, the Buyer shall be deemed substituted for the applicable Seller as a party to the applicable Assigned Contracts and the applicable Seller shall be relieved, pursuant to Section 365(k) of any further liability under the Assigned Contracts.  A list of Sellers' executory contracts and unexpired leases subject to potential assumption and assignment in connection the sale of the Purchased Assets and the cure costs associated therewith is attached to the Cure Notice as Exhibit 1.[9]

**G.     The Sale of the Purchased Assets Does Not Require the Appointment of a Consumer Privacy Ombudsman.**

49.     In connection with the sale of the Purchased Assets pursuant to the APA, Debtors shall be required to abide by their privacy policies in place as of the date of the APA, as such policies may be amended from time to time.  Accordingly, no consumer privacy ombudsman need be appointed in connection with the sale under Section 363(b)(1).

**H.     The Purchase Price Constitutes Reasonably Equivalent Value for the Purchased Assets Transferred.**

50.     A debtor receives reasonably equivalent consideration when "the debtor's net worth has been preserved" following a transfer of its assets.  *Harrison v. N.J. Cmty. Bank (In re Jesup & Lamont, Inc.)*, 507 B.R. 452, 472 (Bankr. S.D.N.Y. 2014); *see also Mellon Bank, N.A. v. Metro Commc'ns, Inc.*, 945 F.2d 635, 646-47 (3d Cir. 1991) ("The touchstone is whether the transaction conferred realizable commercial value on the debtor reasonably equivalent to the realizable commercial value of the assets transferred.").  A finding of reasonably equivalent value does not require exact equivalent exchange of consideration; rather, the benefits a debtor receives from the transfer must approximate its costs.  *Harrison*, 507 B.R. at 472 ("[I]f [the value received]

---

[9]     By this Sale Motion, Debtors request authorization from the Court to have the Sale Motion apply to multiple contracts under Bankruptcy Rule 6006(e) and ask for relief from Bankruptcy Rule 6006(f), to the extent applicable.

138548939_392525-00001

approximates the value of what the debtor transferred, there will be reasonably equivalent value[.]").    Transactions between a debtor and a third-party on an arm's length basis are presumptively for reasonably equivalent value.  *See Mishkin v. Ensminger (In re Adler, Coleman Clearing Corp.)*, 247 B.R. 51, 109 (Bankr. S.D.N.Y. 1999) ("[W]hen there is an arms-length transaction by parties that have equal knowledge, a court should not substitute its own view of a fair market price."  (citing *Cooper v. Ashley Comm., Inc., (In re Morris Communications NC, Inc.)*, 914 F.2d 458, 465, 474-75 (4th Cir. 1990))).

51.    Here, the sale of the Purchased Assets is an arm's-length transaction between the Seller Debtors and an unaffiliated third party.

## WAIVER OF STAY UNDER BANKRUPTCY RULE 6004(H) AND 6006(D)

52.    Debtors also request the Court waive the stay imposed by Bankruptcy Rules 6004(h) and 6006(d).  Bankruptcy Rule 6004(h) provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  Fed. R. Bankr. P. 6004(h).  Bankruptcy Rule 6006(d) further provides that an "order authorizing the trustee to assign an executory contract or unexpired lease under § 365(f) is stayed until the expiration of fourteen (14) days after the entry of the order, unless the court orders otherwise."  Fed. R. Bankr. P. 6006(d).  The sale of the Purchased Assets must be approved and consummated promptly to preserve the value of the Purchased Assets.  Therefore, time is of the essence, and Debtors and the Buyer intend to close the Sale Transaction by April 30, 2019.  Accordingly, as the exigent nature of the requested relief justifies immediate action Debtors respectfully request that the Court waive the fourteen-day stay imposed by Bankruptcy Rules 6004(h) and 6006(d).

138548939_392525-00001

## RESERVATION OF RIGHTS

53.     Nothing contained herein is or should be construed as:  (a) admitting to the validity

of any claim against Debtors; (b) waiving Debtors' rights to dispute any claim on any grounds; (c)

promising to pay any claim; or (d) assuming or rejecting any executory contract or unexpired lease

pursuant to Section 365.

## NOTICE

54.     Debtors will provide notice of this Sale Motion to the following parties or their

counsel, as applicable:  (a) the U.S. Trustee; (b) the holders of the 50 largest unsecured claims

against Debtors (on a consolidated basis); (c) the Prepetition Secured Parties (defined in the First

Day Declaration); (d) the United States Attorney's Office for the Southern District of New York;

(e) the Internal Revenue Service; (f) the United States Securities and Exchange Commission; (g)

the attorneys general in the states where Debtors conduct their business operations; (h) any party

that has requested notice pursuant to Bankruptcy Rule 2002; and (i) counsel for the Committee.

Debtors submit that, in light of the nature of the relief requested, no other or further notice need

be given.

## NO PRIOR REQUEST

55.     No previous request for the relief sought herein has been made to this Court or any

other court.

WHEREFORE, Debtors respectfully request that this Court enter an order,

substantially in the form attached, granting the relief requested in the Sale Motion and such other

and further relief as is just and proper.

138548939_392525-00001

Dated:  April 19, 2019          */s/ Steven J. Reisman*
New York, New York          **KATTEN MUCHIN ROSENMAN LLP**
Steven J. Reisman, Esq.
Jerry L. Hall, Esq. (admitted *pro hac vice*)
Cindi M. Giglio, Esq.
575 Madison Avenue
New York, NY 10022
Telephone:  (212) 940-8800
Facsimile:  (212) 940-8876
Email:      sreisman@kattenlaw.com
            jerry.hall@kattenlaw.com
            cindi.giglio@kattenlaw.com

-and-

Peter A. Siddiqui, Esq. (admitted *pro hac vice*)
**KATTEN MUCHIN ROSENMAN LLP**
525 W. Monroe Street
Chicago, IL 60661
Telephone:  (312) 902-5455
Email:      peter.siddiqui@kattenlaw.com

*Proposed Counsel to Debtors and Debtors-in-Possession*

25

# **EXHIBIT A**

**Proposed Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| SIZMEK INC., *et al.*,[1] | ) | Case No. 19-10971 (SMB) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

### ORDER AUTHORIZING AND APPROVING PRIVATE SALE OF THE DEMAND-SIDE PLATFORM AND THE DATA MANAGEMENT PLATFORM FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS, AND GRANTING RELATED RELIEF

Upon the motion (the "Sale Motion")[2] of the above-captioned debtors and debtors-in-possession (collectively, the "Debtors"), including Sizmek DSP, Inc.; X Plus Two Solutions, LLC; X Plus One Solutions, Inc.; Wireless Developer, Inc.; and Wireless Artist LLC (the "Sellers") for entry of an order (this "Order"), pursuant to Bankruptcy Code Sections 105, 363, 365 and Bankruptcy Rules 2002, 6004, 6006, and 9014, among other things:  (i) authorizing the sale of the Purchased Assets, free and clear of any claim, charge, lien (statutory or otherwise), mortgage, lease, hypothecation, encumbrance, pledge, security interest, option, rights of use, right of first offer, right of first refusal, easement, servitude, restrictive covenant, encroachment, license and other restriction and interest (the "Encumbrances") in any of the Purchased Assets, (ii) authorizing the Sellers to pay a break-up fee and expense reimbursement to the Buyer, under certain conditions set forth in the APA; (iii) authorizing procedures for the assumption and

---

[1]    Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:  Sizmek Inc. (4624); Sizmek DSP, Inc. (2319); Point Roll, Inc. (3173); Sizmek Technologies, Inc. (6402); Wireless Artist LLC (0302); Wireless Developer, Inc. (9686); X Plus One Solutions, Inc. (8106); and X Plus Two Solutions, LLC (4914).  The location of Debtors' service address for purposes of these chapter 11 cases is:  401 Park Avenue South, Fifth Floor, New York, NY 10016.

[2]    Capitalized terms used in this Order but not otherwise defined herein shall have the meanings ascribed to such terms in the Sale Motion or APA, as applicable.

assignment of certain of Sellers' executory contracts and unexpired leases in connection therewith and (iv) granting other related relief; and upon the FTI Declaration, the Company Declaration and the First Day Declaration; and it appearing that the relief requested is in the best interests of Sellers' estates, their creditors, their stakeholders and other parties-in-interest; and the Court having jurisdiction to consider the Sale Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334; and consideration of the Sale Motion and the relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and notice of the Sale Motion and opportunity for objections having been provided; and this Court having heard statements of counsel and the evidence presented in support of the relief requested by Sellers in the Sale Motion at a hearing before this Court (the "Sale Hearing"); and it appearing that no other notice need be given; and it further appearing that the legal and factual bases set forth in the Sale Motion and at the Sale Hearing establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor:

**IT IS HEREBY FOUND AND DETERMINED THAT:[3]**

## Jurisdiction, Final Order and Statutory Predicates

A.      This Court has jurisdiction to hear and determine the Sale Motion pursuant to 28 U.S.C. §§ 157(b)(a) and 1334(a).  This is a core proceeding pursuant to 28 U.S.C. §157(b)(2)(A), (N) and (O).  Venue is proper in this District and in this Court pursuant to 28 U.S.C. §§1408 and 1409.

---

[3]   The findings and conclusions set forth herein shall constitute this Court's findings of fact and conclusions of law as described in Bankruptcy Rule 7052, made applicable to this matter by Bankruptcy Rule 9014.

B.      This Order is a final and appealable order within the meaning of 28 U.S.C. § 158(a). Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), and to any extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rule 7054, this Court expressly finds that there is no reason to delay implementation of this Order.

C.      The predicates for the relief requested in the Sale Motion are Sections 105(a), 363(b), (f) and (m) and 365 of the Bankruptcy Code and Bankruptcy Rules 2002(a)(2), 6004(a), (b), (c), (e), (f) and (h) and 6006(a), (c) and (d), 9007 and 9014.

## Notice of the Sale Transaction

D.      As evidenced by the affidavits of service previously filed with this Court, proper, timely, adequate and sufficient notice of the Sale Hearing and the Sale Transaction has been provided in accordance with Sections 105(a), 363 and 365 and Bankruptcy Rules 2002, 6004, 6006 and 9014.[4]  The notices were good, sufficient and appropriate under the circumstances, provided all interested parties with timely and proper notice of the Sale Hearing and the Sale Transaction, and no further or other notice of the Sale Hearing and the Sale Transaction is required.

## Good Faith of the Buyer

E.      The Buyer is purchasing the Purchased Assets in good faith and is a good faith purchaser within the meaning of Section 363(m), and is therefore entitled to the full protection of that provision, and otherwise has proceeded in good faith in this proceeding in that, *inter alia*, the Buyer:  (i) is not related in any way to the Sellers; (ii) recognized that Sellers were free to deal with any other party interested in acquiring the Purchased Assets; (iii) disclosed all payments it is to make and all agreements or arrangements related to the Sale Transaction; (iv) has not violated

---

[4] Unless otherwise provided, "Section" references are to the Bankruptcy Code.

Section 363(n) by any act or omission; and (v) negotiated and executed the APA at arms' length and in good faith.

F.      In the absence of a stay pending appeal, the Buyer will be acting in good faith pursuant to Section 363(m) in closing the transaction contemplated by the APA, at any time on or after entry of this Order in accordance with the APA.

### Highest and Best Offer

G.      The transaction contemplated by APA constitutes the highest and best offer for the Purchased Assets, and will provide a greater recovery for Sellers' estates than would be provided by any other available alternative. Sellers' determination that the APA constitutes the highest and/or best offer constitutes a valid and sound exercise of Sellers' business judgment.

H.      The APA and its terms represents a fair and reasonable offer to purchase the Purchased Assets under the circumstances of these Chapter 11 Cases. No other person or entity or group of entities has offered to purchase the Purchased Assets for greater value to Sellers' estates than the Buyer.

I.      Approval of the Sale Motion and the APA and the consummation of the transactions contemplated thereby are in the best interests of Sellers, their creditors, their estates and other parties in interest.

J.      The terms of the APA reflect Sellers' exercise of prudent business judgment consistent with their fiduciary duties.

### Bid Protections

K.      The Bid Protections, namely a break-up fee of $250,000 and expense reimbursement up to a maximum of $500,000 (together, the "Bid Protections"), are reasonable in relation to the size of the proposed Sale and under the facts and circumstances of the Sale

Transaction.  The Sellers have articulated good and sufficient business reasons for the Court to approve the Bid Protections.

**No Fraudulent Transfer**

L.      None of Sellers or the Buyer has entered into the APA or proposes consummating the Sale Transaction, for the purpose of hindering, delaying or defrauding Sellers' present or future creditors.  None of Sellers or the Buyer has entered into the APA or proposes consummating the Sale Transaction in violation of fraudulent conveyance and fraudulent transfer laws whether under the Bankruptcy Code or any other applicable law.

M.      The consideration to be provided by the Buyer pursuant to the APA is fair and adequate and constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code and under other applicable law.

N.      The Buyer is not a successor to Sellers or their estates and the Sale does not amount to a consolidation, merger or de facto merger of the Buyer and Sellers.

**Validity of Transfer**

O.      Sellers are hereby authorized to enter into and perform their obligations under the APA; to execute and perform such agreements or documents; and to take such other actions as are necessary or desirable to effectuate the APA.

**Section 363(f) is Satisfied**

P.      The Debtors' secured lenders (Cerberus and Sizmek Finco, LLC) have consented to the sale of the Purchased Assets to the Buyer on the terms set forth in the APA.  Accordingly, the conditions for a sale of the Purchased Assets to the Buyer free and clear of all Encumbrances pursuant to Section 363(f) have been satisfied.

138548939_392525-00001

Q.      The Buyer shall have no obligations with respect to any liabilities of Sellers other than the Assumed Liabilities specifically set forth in and solely to the extent provided pursuant to the APA.

### Compelling Circumstances for an Immediate Sale

R.      To maximize the value of the Purchased Assets and preserve the viability of the businesses to which the Purchased Assets relate, it is essential that the Sale Transaction occur within the time provided in the APA.  Time is of the essence in closing the Sale Transaction.

S.      Given the circumstances of these Chapter 11 Cases and the adequacy of the purchase price under the APA, the proposed Sale Transaction on the terms and conditions set forth in the APA is a reasonable exercise of Sellers' business judgment and should be approved.

T.      The consummation of the transaction is legal, valid and properly authorized under all applicable provisions of the Bankruptcy Code, including, without limitation, Sections 105(a), 363(b), 363(f), 363(m), 365(b) and 365(f) and all applicable requirements of such Sections have been complied with in respect of the transaction.

### NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED:

### General Provisions

1.      The Sale Motion is granted as set forth in this Order.  All objections to the Sale Motion that have not been withdrawn, waived or settled as announced to this Court at the Sale Hearing or by stipulation filed with this Court, and all reservations of rights included therein, are overruled on the merits.

138548939_392525-00001

## Approval of the APA

2.      The APA, attached as Exhibit 1, and all other ancillary documents, and all of the terms and conditions thereof, are approved.

3.      Pursuant to Section 363(b), Sellers are authorized to take any and all actions necessary or appropriate to (a) consummate the Sale Transaction with the Buyer upon the terms and conditions of the APA, (b) close the Sale Transaction upon the terms and conditions of the APA and this Order, and (c) execute, deliver, perform, consummate, implement and close the APA, together with all additional instruments and documents that may be reasonably necessary or appropriate to implement the APA, provided that such additional instruments and documents do not materially change the terms of the APA.

4.      The Bid Protections are approved.  The Sellers are authorized to pay the Bid Protections in accordance with the APA.

5.      This Order and the APA shall inure to the benefit of Sellers, their estates and creditors and the Buyer, and their respective successors and assigns.

## Transfer of the Purchased Assets

6.      Pursuant to Sections 105(a), 363(b), 363(f), 365 and 365(f), Sellers are authorized and directed to transfer the Purchased Assets on the Closing Date.  Such assets shall be transferred to the Buyer upon the terms and conditions of the APA upon and as of the Closing and such transfer shall constitute a legal, valid, binding and effective transfer of the Purchased Assets free and clear of all Encumbrances except for any Permitted Liens and Assumed Liabilities.  Upon the Closing, the Buyer shall take title to and possession of the Purchased Assets subject only to any Permitted Liens.  Pursuant to Section 363(f), the transfer of title to the Purchased Assets shall be free and clear of any and all Encumbrances except for Assumed Liabilities and Permitted Liens.

All Encumbrances on the Purchased Assets other than Permitted Liens shall attach solely to the proceeds of the Sale Transaction with the same validity, priority, force and effect that they now have as against the Purchased Assets, subject to any and all claims and defenses Sellers and their estates have.

7.      Except as expressly permitted or otherwise specifically provided in the APA or this Order, all persons or entities holding Encumbrances in all or any portion of the Purchased Assets (other than Permitted Liens and Assumed Liabilities) arising under or from, or in any way relating to Sellers, the Purchased Assets, the operation of Debtors' business prior to the Closing or the transfer of the Purchased Assets to the Buyer, are forever barred, estopped and permanently enjoined from asserting against the Buyer or its successors or assigns, their property such persons' or entities' Encumbrances in and to the Purchased Assets.  Effective as of the Closing, each creditor is authorized and directed to execute such documents and take all other actions as may be necessary to release any Encumbrances (except for the Permitted Liens) on the Purchased Assets, as provided herein, that may have been recorded or may otherwise exist.  The transactions authorized herein shall be of full force and effect, regardless of any Sellers' lack of good standing in any jurisdiction in which such Debtor is formed or authorized to transact business.  Upon consummation of the transactions set forth in the APA, the Buyer shall be authorized to file termination statements or lien terminations in any required jurisdiction to remove any record, notice filing, or financing statement recorded to attach, perfect or otherwise notice any lien or encumbrance with respect to the Purchased Assets (but not the proceeds thereof) that is extinguished or otherwise released pursuant to this Order under Section 363 and any related provisions.

8.      All persons and entities are forever prohibited and enjoined from taking any action that would adversely affect or interfere with the ability of Sellers to sell and transfer the

Purchased Assets to the Buyer in accordance with the APA and this Order to the fullest extent provided by Section 363.

9.      All persons and entities that are in possession of some or all of the Purchased Assets on the Closing Date are directed to surrender possession of such Purchased Assets to the Buyer or the Buyer Designee at the Closing.

10.      The provisions of this Order authorizing the Sale Transaction by Sellers free and clear of Encumbrances shall be self-executing, and none of Sellers, the Buyer or any other party shall be required to execute or file releases, termination statements, assignments, cancellations, consents or other instruments to effectuate, consummate, and/or implement the provisions hereof with respect to the Sale; provided, however, that this paragraph shall not excuse such parties from performing any and all of their respective obligations under the APA or as otherwise set forth in this Order or requested by Buyer.

11.      Without limiting the foregoing, a certified copy of this Order may be filed with the appropriate clerk or recorded to act to cancel any of the Encumbrances on the Purchased Assets of record except the Permitted Liens.

12.      If any person or entity that has filed statements or other documents or agreements evidencing Encumbrances on all or a portion of the Purchased Assets shall not have delivered to Sellers prior to the Closing, in proper form for filing and executed by appropriate parties, termination statements, instruments of satisfaction, releases of liens and easements, and any other documents necessary or desirable to the Buyer for the purpose of documenting the release of all Encumbrances on the Purchased Assets, which the person or entity has or may assert with respect to all or any portion of the Purchased Assets, Sellers are hereby authorized and directed, and the Buyer is hereby authorized, to execute and file such statements, instruments,

138548939_392525-00001

releases and other documents on behalf of such person or entity with respect to the Purchased Assets.

13.     This Order is binding upon all persons and entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal and local officials and all other persons or entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any lease; and each of the foregoing persons and entities is hereby directed to accept for filing any and all of  the documents and instruments necessary and appropriate to consummate the transactions contemplated by the APA; provided that nothing herein shall relieve any entity of the obligation to pay filing fees required to be paid under non-bankruptcy law.

14.     Any and all governmental recording offices and all other parties, persons or entities are authorized to accept this Order for recordation on or after the Closing as conclusive evidence of the free and clear, and unencumbered, transfer of all right, title, interest and ownership in and to the Purchased Assets conveyed to the Buyer at Closing.

### Payment to Cerberus is Appropriate

15.     In connection with the closing of the Sale Transaction, the Buyer is authorized and directed to pay directly (the "Direct Cerberus Payments") to Cerberus Business Finance, LLC ("Cerberus"), as administrative agent and collateral agent for certain revolver and term loan lenders (the "Senior Lenders" and, together with Cerberus, the "Secured Parties") under that certain Financing Agreement, dated as of September 6, 2017 (as subsequently amended from time to time, the "Financing Agreement"), all amounts that are payable by the Buyer at closing

138548939_392525-00001

(whether in the form of cash or otherwise) and fifty percent (50%) of the Subsequent Payments, namely all amounts that may subsequently become payable by the Buyer under the APA or under any related documents. Cerberus is authorized to apply the Direct Cerberus Payments to satisfy amounts owed to the Secured Parties under the Financing Agreement in accordance with the terms and conditions thereof. The authority for Cerberus to receive and apply the Direct Cerberus Payments under this Order will not restrict the relief that might be sought by any party in interest against the Secured Parties pursuant to the terms and conditions of the *Interim Order (I) Authorizing the Debtors to Use Cash Collateral Pursuant to 11 U.S.C. § 363, and (II) Granting Adequate Protection Pursuant to 11 U.S.C. §§ 361, 362, 363, and 507, and Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001(b)* [Dkt. 37] or any successor order thereto, as to which possible relief the rights of all parties (including the Secured Parties) are fully reserved.

### Procedure for Assignment and Assumption of Assigned Contracts

16.    The Cure Notice substantially in the form attached to the Sale Order as Exhibit 2 is hereby approved.

17.    A hearing to consider approval of the Assumption and Assignment Order shall be scheduled for at a hearing on May 6, 2019, or such other date as is scheduled by the Court.

### Other Provisions

18.    In connection with the sale of the Purchased Assets, Debtors shall be required to abide by their privacy policies in place as of the date of the APA, as such policies may be amended from time to time. Accordingly, no consumer privacy ombudsman will be appointed in connection with the sale under Section 363(b)(1).

19.    The Buyer is not and shall not be deemed a successor to the Sellers as a result of the consummation of the Sale Transaction. The Buyer has given substantial consideration

under the APA for the benefit of the Sellers, their estates and the holders of any Encumbrances. The consideration given by the Buyer is valid and valuable consideration for the releases of any potential claims of successor or transferee liability against the Buyer, which releases shall be deemed to have been given in favor of the Buyer by all holders of Encumbrances against any of the Sellers or any of the Purchased Assets.

20.    Effective upon the Closing of the Sale Transaction: (a) all holders of Encumbrances are hereby barred and permanently enjoined from in any way asserting or pursuing such Encumbrances against the Buyer, the Buyer's successors or assigns and/or the Purchased Assets; (b) all holders of Encumbrances are hereby barred and permanently enjoined from in any way asserting or pursuing any action against the Buyer, the Buyer's successors or assigns and/or the Purchased Assets based on any theory of successor or transferee liability; and (c) no holder of any Encumbrance shall in any way interfere with the Buyer's possession of, title to, or use and enjoyment of the Purchased Assets.

21.    Notwithstanding any provision of this Order, the APA, other documents, or otherwise, all rights, claims, defenses, causes of action (including Avoidance Actions) and rights of offset or counterclaim of Sellers against Buyer, Buyer Designee, or their respective Affiliates, are expressly retained by Sellers.

22.    The Buyer has acted in good faith and has not colluded in undertaking the Sale Transaction.  The Buyer is entitled to all of the protections afforded by Section 363(m), and the Sale Transaction may not be avoided, nor may any costs or damages be imposed, under Section 363(n).

23.    Nothing contained in any chapter 11 plan confirmed in any of Debtors' Chapter 11 Cases, any order confirming any such chapter 11 plan, any order approving wind-down

or dismissal of any of Debtors' Chapter 11 Cases or any subsequent chapter 7 cases, or any other order of any type or kind entered in Debtors' Chapter 11 Cases shall conflict with or derogate from the provisions of the APA or the terms of this Order, and to the extent of any conflict or derogation between this Order or the APA and such future plan or order, the terms of this Order and the APA shall control.

24.    Pursuant to Bankruptcy Rules 7062, 9014, 6004(h), and 6006(d), this Order shall be effective immediately upon entry and Sellers and Buyer are authorized to close the Sale Transaction immediately upon entry of this Order.

25.    No bulk sales or similar law of any state or jurisdiction applies to the Sale.

26.    Except for FTICA, there are no brokers involved in consummating the Sale Transaction and no brokers' commissions are due.

27.    The failure to identify any particular provision of the APA in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of this Court that the APA be authorized and approved in its entirety.

28.    The APA and any related agreements or other instruments (other than this Order) may be modified, amended or supplemented by the parties thereto and in accordance with the terms thereof, without further order of this Court, provided that any such modification, amendment or supplement does not have a material adverse effect on Sellers' estates.

29.    The terms of this Order shall govern any inconsistencies between the terms of this Order and the APA.

30.    All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

31.     This Court shall retain jurisdiction to, among other things, interpret, implement and enforce the terms of the Order and the APA, all amendments thereto and any waivers and consents thereunder and each of the agreements executed in connection therewith to which Sellers are a party or which had been assigned by Sellers to the Buyer, and to adjudicate, if necessary, any and all disputes relating in any way to the Sale Transaction.

Dated: _____, 2019
New York, New York

_____
THE HONORABLE STUART M. BERNSTEIN
UNITED STATES BANKRUPTCY JUDGE

138548939_392525-00001

**<u>Exhibit 1 to the Sale Order</u>**

**Asset Purchase Agreement**

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (the "Agreement") is made and entered into as of April 18, 2019 (the "Execution Date") by and among SIZMEK DSP INC., a Delaware corporation f/k/a Rocket Fuel Inc. ("Sizmek DSP"), X Plus Two Solutions, LLC, a Delaware limited liability company ("X Plus Two"), X Plus One Solutions, Inc., a Delaware corporation ("X Plus One"), WirelessDeveloper, Inc., a Michigan corporation ("WirelessDeveloper"), Wireless Artist LLC, a Michigan limited liability company ("Wireless Artist" and together with Sizmek DSP, X Plus Two, X Plus One and WirelessDeveloper, each as Debtor and Debtor-in-Possession in the Bankruptcy Case (as defined below) the "Debtors", and together with each Target Subsidiary (as defined below) who becomes a party hereto after the date hereof, a "Seller" and collectively, "Sellers"), and Zeta Global Holdings Corp., a Delaware corporation (or one of its direct or indirect subsidiaries) ("Purchaser").   Capitalized terms used herein but not otherwise defined shall have the meanings set forth in Article I of this Agreement.

### R E C I T A L S

WHEREAS, on March 29, 2019, Debtors commenced Case No. 19-10971 (the "Bankruptcy Case") by filing a voluntary petition for relief under Chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court");

WHEREAS, Sellers are engaged in the business of internet advertising and related managed services under the demand side platform and the data management platform (such businesses, as presently conducted by Sellers, shall be collectively referred to herein as the "Business"), and (other than any Target Subsidiary) are operating the Business as Debtors and Debtors-in-Possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code;

WHEREAS, Sizmek DSP is the sole owner of all of the issued and outstanding equity interests of each of the companies set forth on Annex I (such companies, the "DSP Direct Subsidiaries"), and Rocket Fuel Ltd., a United Kingdom private limited company and wholly owned subsidiary of Sizmek DSP, is the sole owner of all of the issued and outstanding equity interests of each of the companies set forth on Annex II (such companies, the "DSP Indirect Subsidiaries" and collectively with the DSP Direct Subsidiaries, the "Target Subsidiaries");

WHEREAS, Sellers wish to sell, transfer, convey, assign and deliver to Purchaser, in accordance with Sections 363 and 365 and the other applicable provisions of the Bankruptcy Code (as applicable), all of the Purchased Assets (defined below), together with the Assumed Liabilities (defined below) of Sellers upon the terms and subject to the conditions set forth in this Agreement (hereinafter collectively referred to as the "Transaction");

WHEREAS, Purchaser wishes to purchase and take delivery of such Purchased Assets and Assumed Liabilities upon such terms and subject to such conditions;

WHEREAS, the Purchased Assets will be sold pursuant to a Sale Order of the Bankruptcy Court approving such sale under Section 363 of the Bankruptcy Code and such Sale Order may include the assumption and assignment of certain executory contracts and service agreements,

1

unexpired leases of equipment and liabilities thereunder, under Section 365 of the Bankruptcy Code and pursuant to the terms and conditions of this Agreement; and

WHEREAS, all of the obligations of the parties under this Agreement are conditioned upon the approval of the Bankruptcy Court in accordance with Article IV hereof.

NOW, THEREFORE, in consideration of the premises and mutual covenants and agreements herein set forth and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties hereto hereby agree as follows:

## ARTICLE I
## DEFINITIONS

Section 1.1    For purposes of this Agreement (including the Disclosure Schedules hereto) the terms defined in this Agreement shall have the respective meanings specified herein, and, in addition, the following terms shall have the following meanings:

"Accounts Receivable" means, with respect to any Seller and a particular date, (i) any and all accounts receivable, trade accounts and other amounts (including overdue accounts receivable) owed to such Seller relating to, or arising in connection with, the operation and conduct of, the Business or otherwise and any other similar rights of such Seller to payment from third parties whether or not invoiced as of such date, and the full benefit of all security for such accounts or rights to payment, including all trade accounts receivable representing amounts receivable in respect of services rendered, in each case owing to such Seller; (ii) all other accounts or notes receivable of such Seller and the full benefit of all security for such accounts or notes receivable; and (iii) any and all claims, remedies or other rights relating to any of the foregoing, together with any interest or unpaid financing charges accrued thereon, in each case that have not been satisfied or discharged prior to the close of business on the day immediately preceding such date or have not been written off or sent to collection prior to the close of business on the day immediately preceding such date (it being understood that the receipt of a check prior to the close of business on the day immediately preceding such date shall constitute satisfaction or discharge of the applicable account or note receivable to the extent of the payment represented thereby).

"Affiliate" means, as to any Person, any other Person, which, directly or indirectly, is in control of, is controlled by, or is under common control with, such Person.  The term "control" (including, with correlative meanings, the terms "controlled by" and "under common control with"), as applied to any Person, means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities or other direct or indirect ownership interest, by Contract or otherwise.

"Bankruptcy Code" means 11 U.S.C. Section 101, et. seq., and any amendments thereof.

"Cash and Cash Equivalents" means all of Sellers' cash (including petty cash but excluding any checks that remain uncashed or uncleared prior to the close of business on the Closing Date), checking account balances, marketable securities, certificates of deposits, time deposits, bankers' acceptances, commercial paper and government securities and other cash equivalents.

"Code" means the Internal Revenue Code of 1986, as amended.

"Contract" means any written or oral contract, agreement, lease, license, financial instrument, or other document or commitment, arrangement, undertaking, practice or authorization that is binding on any Person or its property under any applicable Law.

"Disclosure Schedules" means the schedules delivered by Sellers to Purchaser as of the Execution Date setting forth the exceptions to the representations and warranties contained in Article VII and certain other information called for by this Agreement. Unless otherwise specified, each reference in this Agreement to any numbered schedule is a reference to the corresponding numbered schedule that is included in the Disclosure Schedules (unless, and to the extent, the relevance to other representations and warranties is readily apparent from the actual text of the disclosures).

"Employee Plans" means any employment, consulting, severance or other similar contract, plan, arrangement or policy, and each plan, arrangement (written or oral), program, agreement or commitment providing for insurance coverage (including any self-insured arrangements), workers' compensation, disability benefits, supplemental unemployment benefits, vacation benefits, retirement benefits, life, health, disability or accident benefits or for deferred compensation, profit-sharing bonuses, stock options, stock purchases or other forms of incentive compensation or post-retirement insurance, compensation or benefits which is entered into, maintained, contributed to or required to be contributed to, by any Seller or an ERISA Affiliate or under which any Seller or any ERISA Affiliate may incur any liability including under any "employee pension benefit plan" as defined in Section 3(2) of ERISA and any "employee welfare benefit plan" as defined in Section 3(1) of ERISA which any Seller or any ERISA Affiliate maintains, administers, contributes to or is required to contribute to, or has maintained, administered, contributed to or was required to contribute to, or under which any Seller or any ERISA Affiliate may incur any liability.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, or any successor law, and regulations and rules issued pursuant thereto or pursuant to any successor law.

"First Lien Agent" means Cerberus Business Finance, LLC, in its capacity as administrative agent and collateral agent under that certain Financing Agreement, dated as of September 6, 2017, by and among Sizmek Technologies, Inc., as borrower, Solomon Acquisition Corp. and the other guarantors party or joined thereto and the lenders from time to time party thereto, as amended by the First Amendment to Financing Agreement, dated as of April 2, 2018, as amended by the Second Amendment to Financing Agreement, dated as of April 27, 2018, as amended by the Third Amendment to Financing Agreement, dated as of May 30, 2018, as amended by the Fourth Amendment to Financing Agreement, dated as of June 29, 2018, as amended by the Fifth Amendment to Financing Agreement, dated as of July 19, 2018, as amended by the Sixth Amendment to Financing Agreement, dated as of August 6, 2018, and as further amended, amended and restated, supplemented or otherwise modified from time to time.

"Governmental Authority" means any federal, state, provincial, municipal and foreign governmental entity, authority, or agency, or any other political subdivision, or any entity exercising executive, legislative, judicial, regulatory or administrative functions of government.

3

"Knowledge" means in the case of Sellers, the actual, current knowledge of Markus Plattner, Sascha Wittler, Mark Grether and George Pappachen, after reasonable inquiry.

"Laws" means any federal, state, provincial, local or foreign statute, law, ordinance, regulation, rule, code, order or other requirement or rule of law.

"Legal Proceeding" means any action, arbitration, audit, hearing, investigation, litigation or suit (whether civil, criminal, administrative, investigative or informal) commenced, brought, conducted or heard by or before, or otherwise involving, any Governmental Authority or arbitrator.

"Liability" means any liability, indebtedness, obligation, expense, claim, loss, cost, damage, obligation, responsibility, guaranty or endorsement of or by any Person, absolute or contingent, accrued or unaccrued, known or unknown, due or to become due, liquidated or unliquidated, whether or not secured.

"Liens" means any security interests, mortgages, interests, liens, pledges, charges, defects of title, options and other rights of third parties, rights of first refusal, claims (as defined in Section 101 of the Bankruptcy Code), or any other encumbrance or restriction on ownership provided such encumbrance or restriction on ownership can be overridden by Section 363 of the Bankruptcy Code, but specifically excluding Permitted Liens.

"Material Adverse Effect" means any event or change or circumstance, in respect of the operation of the Business and Purchased Assets that, individually or when aggregated with any one or more of the other such changes, events or circumstances, has had or could reasonably be expected to have a material adverse effect on the Purchased Assets, taken as a whole; provided, however, that none of the following events, changes or circumstances (individually or when aggregated with any one or more of the other such changes, events or circumstances) shall be deemed to be or constitute a Material Adverse Effect, and none of the following changes, events or circumstances (individually or when aggregated with any one or more of the other such changes, events or circumstances) shall be taken into account when determining whether a Material Adverse Effect has occurred: (i) war, acts of nature, general strike, acts of terror, (ii) general economic, market or political changes or conditions, (iii) events, changes or circumstances which generally affect the industries in which Sellers conduct business, (iv) changes in Laws, unless such Laws or conditions apply solely or principally to the Business or Sellers, (v) actions or omissions taken or not taken by or on behalf of Sellers in compliance with a specific request from or consented to in writing by Purchaser following the execution of this Agreement, or in compliance with an order from the Bankruptcy Court and (vi) events, changes or circumstances arising from or caused by the announcement of this Agreement or commencement of the Bankruptcy Case or the events, changes or circumstances that substantially contributed to, or resulted in, the commencement of the Bankruptcy Case, or the reasonably anticipated effects of the Bankruptcy Case.

"Net Shared Accounts Receivable" means (a) the Shared Accounts Receivable minus (b) the Media Accounts Payable.

"Ordinary Course of Business" means the ordinary course of business of Sellers consistent with the current custom and practice of Sellers (including with respect to quantity and frequency) in light of Sellers' current financial condition, financial distress and pending Bankruptcy Case.

EAST\166026559.2
US_138623865v13_392525-00029 4/18/2019 4:07 PM

"Permitted Liens" means (i) statutory Liens of landlords, banks, carriers, warehousemen, mechanics, repairmen, workmen, suppliers and materialmen, in each case, incurred in the ordinary course of business (A) for amounts not yet overdue, (B) for amounts that are overdue and that (in the case of any such amounts overdue for a period in excess of thirty (30) days) are being contested in good faith or (C) for amounts as to which payment and enforcement is stayed under the Bankruptcy Code or pursuant to orders of the Bankruptcy Court, (ii) Liens for Taxes not yet due and payable or for Taxes that may thereafter be paid without penalty or which are being contested in good faith by appropriate proceedings, (iii) rights of setoff or banker's liens upon deposits of cash in favor of banks or other depositary institutions, (iv) pledges or deposits under worker's compensation, unemployment insurance and social security laws to the extent required by applicable Law, (v) rights of third parties pursuant to ground leases, leases, subleases, licenses, concessions or similar agreements, (vi) easements, covenants, conditions, restrictions and other similar matters of record or imperfections of title with respect to real property that do not individually or in the aggregate in any material respect interfere with the present use of the property subject thereto, (vii) local, county, state and federal ordinances, regulations, building codes or permits, now or hereafter in effect, relating to real property, (viii) restrictions or requirements set forth in the Sale Order relating to the Purchased Assets, (ix) Liens directly caused by or directly resulting from the acts of Purchaser or any of its Affiliates, employees, officers, directors, agents, contractors, invitees or licensees, (x) encroachments, overlaps, boundary line disputes and any other matters which would be disclosed by an accurate survey and inspection of real property and that do not materially impair the use of real property for its intended purpose, (xi) Liens arising by operation of Law under Article 2 of any state's Uniform Commercial Code (or successor statute) in favor of a seller of goods or buyer of goods, (xii) any Lien that will be extinguished at or prior to Closing, and (xiii) in the case of the Target Subsidiaries, Liens arising by operation of law in their respective jurisdictions of formation or incorporation.

"Person" shall mean any individual, sole proprietorship, partnership, joint venture, trust, unincorporated association, corporation, limited liability company, entity or Governmental Authority (whether federal, state, county, city or otherwise and including any instrumentality, division, agency or department thereof).

"Sale Motion" means the motion to be filed with the Bankruptcy Court by Sellers, in form and substance satisfactory to the First Lien Agent (in its discretion), seeking (i) approval of the terms and conditions of the Transaction Documents, and (ii) authorization for the sale of the Purchased Assets by the Debtors pursuant to Section 363 of the Bankruptcy Code and the assumption and assignment of the Purchased Assets that are executory contracts pursuant to Section 365 of the Bankruptcy Code, free and clear of all Liens, all as provided in the Sale Order.

"Sale Order" means the order of the Bankruptcy Court, substantially in the form attached as Exhibit A, provided that Exhibit A must be satisfactory to the First Lien Agent (in its discretion).

"Shared Accounts Receivable" means the Accounts Receivable of Sellers attributable to, or arising out of sales or services provided by Sellers during, the period ending on or prior to April 30, 2019 (whether or not invoiced as of such date), which includes, for the avoidance of doubt, invoiced Accounts Receivable of Sellers outstanding as of the Closing and Accounts Receivable of Sellers that is invoiced after the Closing that is attributable to, or arising out of sales or services provided by Sellers on or prior to April 30, 2019.

"Taxes" mean any federal, state, local or foreign income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, property (including general and special real estate taxes and assessments, special service area charges, tax increment financing, charges, payments in lieu of taxes and similar charges and assessments), windfall profits, environmental (including tax under Code Section 59A), customs duties, capital stock, franchise, profits, withholding, foreign or domestic withholding, social security (or similar), unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated or other tax, governmental fee, governmental assessment or governmental charge of a similar nature, whether computed on a separate or consolidated, unitary or combined basis or in any other manner including any interest, penalties or additions to Tax or additional amounts with respect to the foregoing whether disputed or not.

"Tax Return" means any return, report, information return or other document (including any related or supporting information) filed or required to be filed in connection with the determination, assessment or collection of Taxes of any party or the administration of any Laws, regulations or administrative requirements relating to any Taxes.

## ARTICLE II
## PURCHASE AND SALE OF PURCHASED ASSETS; EXCLUDED ASSETS; ASSUMPTION OF LIABILITIES

Section 2.1    Purchased Assets.  Upon the terms and subject to the conditions set forth in this Agreement, subject to Bankruptcy Court approval, at the Closing, each Seller shall sell, convey, transfer, assign and deliver to Purchaser, and Purchaser shall purchase, acquire and take assignment and delivery from each Seller, all of each Seller's right and title to and interest in and to the following assets, properties, and rights (contractual or otherwise) owned by such Seller, in each case, which primarily relate to, or are primarily used or held for use, in connection with the Business (collectively, the "Purchased Assets") free and clear of all Liens, claims or interests of any type or nature, whether known or unknown, of any Seller or any other party:

(a)    the equipment, machinery or other tangible personal property, specifically listed or described in Schedule 2.1(a) hereto and any warranty rights or claims associated therewith;

(b)    subject to the timing and process contemplated by the Sale Order, the contracts, agreements, contract rights, leases of real property, leases of equipment, machinery or other tangible personal property license agreements, customer contracts, purchase and sales orders (if any), financial instruments, royalty agreements, third party guaranties, indemnifications, arrangements and understandings, whether oral or written, to which any Seller is a party (whether or not legally bound thereby) and which relate to the Purchased Assets and the operation of the Business, specifically listed or described in Schedule 2.1(b) hereto as such schedule may be amended pursuant to Section 2.3(c) below (the "Assumed Contracts"), it being understood that Purchaser shall be solely responsible for any "cure payments" required to be made under Section 365 of the Bankruptcy Code in connection with any assumption and assignment of an Assumed Contract to Purchaser;

6

(c)      the permits specifically listed or described in <u>Schedule 2.1(c)</u> transferable to Purchaser pursuant to their terms and in accordance with applicable Laws;

(d)      all intellectual property and intellectual property rights which primarily relate to, or are primarily used or held for use, in connection with, the Business (the "<u>Intellectual Property</u>"), including the Intellectual Property listed or described in <u>Schedule 2.1(d)</u> hereto;

(e)      the prepaid items and or expenses specifically listed or described in <u>Schedule 2.1(e)</u> hereto;

(f)      the books and records including customer or client lists, files, documentation, records and the related documentation related to the Purchased Assets or Assumed Liabilities other than those described in <u>Section 2.2(g)</u>;

(g)      all claims, indemnities, warranties, guarantees, refunds, causes of action, rights of recovery, rights of set-off and rights of recoupment of every kind and nature (whether or not known or unknown or contingent or non-contingent) related to the Purchased Assets or the Assumed Liabilities (other than those (i) on insurance policies of any Seller, or (ii) claims otherwise prosecutable by the chapter 11 estate for the benefit of unsecured creditors, as more fully described in <u>Section 2.2(f)</u> below);

(h)      subject to <u>Section 3.3</u>, all Accounts Receivable payable to Sellers by customers of the Business;

(i)      the deposits and prepayments held by third parties pursuant to any Assumed Contract; and

(j)      other than the Excluded Assets, each Seller's right, title and interest in and to all other assets, whether real or personal, tangible or intangible, which primarily relate to, or are primarily used or held for use in connection with the operation of the Business.

Section 2.2      <u>Excluded Assets</u>.  Notwithstanding the foregoing, the Purchased Assets shall exclude all assets, properties and/or rights of each Seller that are not included in the Purchased Assets (collectively, the "<u>Excluded Assets</u>"), including the following:

(a)      all Cash and Cash Equivalents;

(b)      the Cash Purchase Price;

(c)      any permits that are not transferable pursuant to their terms and in accordance with applicable Laws;

(d)      any Contracts that are not Assumed Contracts listed on <u>Schedule 2.1(b)</u> hereto (the "<u>Excluded Contracts</u>");

(e)      the Stock Consideration;

7

(f)     all claims and actions of each Seller arising under Sections 544, 547, 548, 549, 550 and 553 of the Bankruptcy Code or similar state laws;

(g)     any of the following books and records: corporate seals, organizational documents, corporate governance agreements, minute books, stock books, books of account or other records having to do with the corporate organization or governance of each Seller, all employee-related or employee benefit-related files or records (other than personnel files of Transferred Employees), and any other books and records which any Seller is prohibited from disclosing or transferring to Purchaser under applicable Law and is required by applicable Law to retain;

(h)     all insurance policies of each Seller and all rights to applicable claims and proceeds thereunder;

(i)     equity securities or other ownership interest of Sellers and any of Sellers' direct or indirect subsidiaries including the Target Subsidiaries;

(j)     Sellers' claims for and rights to receive Tax refunds with respect to taxable periods (or portions thereof) ending prior to May 1, 2019, and Tax Returns with respect to taxable periods (or portions thereof) ending prior to May 1, 2019, and any notes, worksheets, files or documents relating thereto;

(k)     Sellers' bank accounts;

(l)     any adequate assurance deposit under Section 366 of the Bankruptcy Code;

(m)     Sellers' rights under this Agreement, including rights relating to the Purchase Price hereunder, any agreement, certificate, instrument or other document executed and delivered between Sellers and Purchaser in connection with the transactions contemplated hereby, and any other agreement between any Seller and Purchaser entered into on or after the date hereof; and

(n)     any assets, rights or properties that are primarily related to, or used or held for use in, the Peer 39 business, ad serving business or any other business lines of Sellers that are not the Business.

Section 2.3    Assumed Liabilities; Excluded Liabilities.

(a)     At the Closing, Purchaser shall assume and agree to perform and discharge only the following Liabilities of each Seller to the extent not previously performed or discharged, and no others (collectively, the "Assumed Liabilities"):

(i)     (x) all Liabilities of each Seller which first accrue and are to be performed from and after the earlier of Closing and May 1, 2019 under the Assumed Contracts, and which relate solely to periods of time on or after the earlier of Closing and May 1, 2019 and (y) all Cure Costs with respect to the Assumed Contracts;

8

(ii)      all Liabilities and obligations relating to and arising from operation, possession or ownership of or interest in the Purchased Assets with effect from the earlier of Closing and May 1, 2019 including, without limitation, all trade accounts payable of Sellers to third parties from and after the earlier of Closing and May 1, 2019 in connection with the Business;

(iii)     all Liabilities including wages and commissions relating to the employment of the Transferred Employees which become due on or after the earlier of Closing and May 1, 2019 (it being acknowledged that (A) Sellers shall be liable for the payroll and wages due on or prior to the earlier of the Closing Date and April 30, 2019 and (B) Purchaser may seek to pay commissions owing to any Transferred Employee as retention payments which are payable over a period of up to six (6) months following the Closing);

(iv)     all Liabilities directly arising from or directly related to a breach or default by Purchaser of this Agreement or any agreement delivered hereunder; and

(v)      notwithstanding subsections (i) and (ii) above, in addition, all trade accounts payable of Sellers to third parties from and after the Petition Date in connection with the Business that remain unpaid as of the Closing Date (as generally described on Schedule 2.3(a)(v)), including all trade accounts payable of Sellers owed to media vendors of Sellers which has been accrued or invoiced during the calendar month of April 2019 (whether or not invoiced as of such date) (such trade accounts payable to media vendors, the "Media Accounts Payable").

If Sellers have paid any of the Assumed Liabilities on or after April 30, 2019 and prior to the Closing Date, then the Closing Cash Payment shall be increased dollar for dollar in the amount of any such payment; provided, however, that without the consent of Purchaser (which shall not be unreasonably withheld), Sellers shall not pay any such Assumed Liabilities which are commissions or other obligations which are not yet due and payable.

(b)      Other than the Assumed Liabilities, Purchaser shall not assume or be bound by or be obligated or responsible for any duties, responsibilities, services, commitments, expenses, obligations or liabilities of any Seller or any Target Subsidiary or relating to the Purchased Assets (or which may be asserted against or imposed upon Purchaser as a successor or transferee of any Seller or any Target Subsidiary as an acquirer of the Purchased Assets as a matter of law) of any kind or nature, fixed or contingent, known or unknown, including, without limitation, the following (collectively, the "Excluded Liabilities"):

(i)      any Liability of any Seller or any Target Subsidiary in respect of any Taxes for any period prior to the earlier of the Closing Date and May 1, 2019, other than any Assumed Liability described in Section 2.3(a)(iii);

(ii)      any Liability of any Seller or any Target Subsidiary under any Excluded Contract or Excluded Assets;

(iii)     any Liability of any Seller or any Target Subsidiary relating to and arising from any Seller's operation, possession or ownership of or interest in of the Purchased Assets prior to the earlier of the Closing Date and May 1, 2019, other than any Assumed Liability described in Section 2.3(a)(iii) and Section 2.3(a)(v);

9

(iv)    any Liability of any Seller or any Target Subsidiary arising out of or resulting from its compliance or noncompliance with any Law;

(v)    any Liability of any Seller or any Target Subsidiary relating to any Legal Proceeding arising out of or in connection with the conduct of the Business or any other conduct of any Seller or any Target Subsidiary or any of its officers, directors, employees, consultants, agents or advisors, in each case, prior to the earlier of the Closing Date and May 1, 2019 (other than the Assumed Liabilities and any Liabilities arising from or related to a breach or default by Purchaser of this Agreement);

(vi)    any Liabilities of any Seller or any Target Subsidiary arising under or in connection with any Employee Plans of, or maintained or required to be maintained by, any Seller, other than any Assumed Liability described in Section 2.3(a)(iii);

(vii)    any Liability of any Seller or any Target Subsidiary to pay any fees or commissions to any broker or finder in connection with the transactions contemplated by this Agreement; and

(viii)    any other Liability of any Seller or any Target Subsidiary that is not an Assumed Liability.

(c)    Purchaser may amend the Schedules setting forth the Assumed Contracts and the Excluded Contracts attached hereto at any time on or before one (1) business day prior to the Closing Date in order to exclude from the definition of Assumed Contract, and include in the definition of Excluded Contract, any Contract not otherwise excluded in the definition thereof. The Assumed Contracts shall be assumed by the applicable Seller and assigned to Purchaser in accordance with the requirements of Section 365 of the Bankruptcy Code and the Sale Order, and Purchaser shall be solely obligated to pay, on or after the Closing Date, all amounts needed to cure any defaults to the extent such defaults are required to be cured and such cure amounts are required to be paid as a condition to assumption and assignment of any such Assumed Contracts ("Cure Costs").

Section 2.4    Required Consents.

(a)    Notwithstanding anything to the contrary contained herein, to the extent that the sale, conveyance, transfer, assignment or delivery or attempted sale, conveyance, transfer, assignment or delivery to Purchaser of any Purchased Asset (including pursuant to Sections 363 and 365 of the Bankruptcy Code) (i) is prohibited by any applicable Law or (ii) would require the consent of any third party or any Governmental Authority and such consent cannot be effectively overridden or canceled by the Sale Order or other related order of the Bankruptcy Court (all such required consents of third parties which are necessary for the consummation of the transactions contemplated hereby, the "Required Consents") and shall otherwise not have been obtained prior to Closing, this Agreement shall not constitute a sale, conveyance, transfer, assignment or delivery, or an attempted sale, conveyance, transfer, assignment or delivery of such Purchased Asset (a "Deferred Asset") and the provisions set forth below in Section 2.4(b) shall govern.

(b)    For a period of sixty (60) days following the Closing Date (or such shorter period as Sellers are in existence), the parties hereto shall have a continuing obligation to use their

10

respective commercially reasonable efforts to cooperate with each other and to obtain promptly all Required Consents and each party hereto shall provide all of the assistance that is reasonably requested by the other party hereto in connection with securing such Required Consents; provided, however, that the parties' obligations under this Section 2.4(b) shall be subject to the Efforts Conditions.  If, with respect to any Deferred Asset, any such Required Consent is not obtained on or before the date that is sixty (60) days after the Closing Date, then such Deferred Asset shall be deemed to be an Excluded Asset for all purposes of this Agreement.

(c)     If, at any time after entry of the Sale Order by the Bankruptcy Court and for a period of up to ninety (90) days following  the Closing Date (or such shorter period as Sellers are in existence), (i) Purchaser identifies any asset of Sellers or of any Target Subsidiary that it believes is both material and necessary to purchase that is not a Purchased Asset pursuant to Section 2.1, (ii) Sellers and the First Lien Agent agree in writing that such asset should be a Purchased Asset, and (iii) such asset is still owned by Sellers or any Target Subsidiary, then such asset shall be deemed to be a Purchased Asset for all purposes of this Agreement, and the applicable Seller shall use its commercially reasonable efforts to convey such asset to Purchaser. To the extent such asset is held by a Target Subsidiary, each Seller shall use its commercially reasonable efforts to cause such Target Subsidiary to convey such asset to Purchaser at or following the Closing (which may include such Target Subsidiary becoming a party hereto as a Seller).  For the avoidance of doubt, to the extent any contract is deemed to be a Purchased Asset pursuant to this Section 2.4(c), such Contract shall be deemed to be an Assumed Contract for all purposes of this Agreement.

### ARTICLE III
### PURCHASE PRICE; ALLOCATION

Section 3.1     Purchase Price.  In exchange for the sale, assignment, transfer, conveyance and delivery from Sellers of the Purchased Assets, Purchaser shall provide consideration (collectively, the "Purchase Price"), consisting of:

(a)     The assumption of the Assumed Liabilities pursuant to this Agreement;

(b)     The issuance to the First Lien Agent or its designee(s) of 383,436 shares of Series F-3 Preferred Stock, par value $0.001 per share, of Zeta Global Holdings Corp. for a price per share of $13.04 (the "Stock Consideration") with a deemed aggregate value as of the Closing Date of Five Million U.S. Dollars ($5,000,000.00), to be issued pursuant to the terms of the Joinder and Subscription Agreement; provided however, in the event that the balance of the Net Shared Accounts Receivable (as reasonably determined at the Closing by Sellers and Purchaser in consultation with the First Lien Agent) is less than Thirty Five Million U.S. Dollars ($35,000,000), Purchaser may reduce the Stock Consideration (by issuing fewer shares) to reflect a reduction in the aggregate value thereof in an amount equal to $0.50 of Stock Consideration for each $1.00 by which the balance of Net Shared Accounts Receivable is less Thirty Five Million U.S. Dollars ($35,000,000) (by way of example, if the Net Shared Accounts Receivable balance at Closing is $30,000,000, the Stock Consideration may be reduced by $2,500,000); provided further, if the Net Shared Accounts Receivable is less than Thirty Million U.S. Dollars ($30,000,000), any reduction in the Stock Consideration pursuant to this Section 3.1(b) shall be capped at Two Million Five Hundred Thousand U.S. Dollars ($2,500,000) and the provisions of Section 3.3(b) shall apply;

11

(c)     Ten Million U.S. Dollars ($10,000,000) (the "Closing Cash Payment"), subject to adjustment pursuant to Section 2.3(a), which shall be paid to Sellers (or their designee(s)); and

(d)     The Contingent Payments (as defined below).

Section 3.2    Deposit.  Concurrently with the execution of this Agreement but not later than April 22, 2019, Purchaser has provided (or shall provide) in good faith a cash deposit in the amount of One Million Five Hundred Thousand U.S. Dollars ($1,500,000) which amount shall be deposited and held in escrow with First American Title (the "Deposit").  If the Closing occurs, subject to the Sale Order, the Deposit shall be released to Sellers (or their designee(s)) and credited towards the Closing Cash Payment.  If the Closing does not occur, then the Deposit shall be disbursed as follows: (i) in the event of a termination of this Agreement by Sellers pursuant to Section 12.2(c), the Deposit shall be released to Sellers (or their designee(s)) as liquidated damages; (ii) in the event of a termination of this Agreement by Sellers or Purchaser pursuant to Section 12.2(f), one-half of the Deposit shall be released to Sellers (or their designee(s)) and one-half of the Deposit shall be released to Purchaser; or (iii) in the event of a termination of this Agreement for any reason other than those specified in clauses (i) or (ii) above, the Deposit shall be returned to Purchaser.

Section 3.3    Contingent Payments. Purchaser shall make a payment in cash to Sellers (or their designee(s)) on the dates set forth below (each such payment, a "Contingent Payment" and collectively with all Contingent Payments together with the Closing Cash Payment, the "Cash Purchase Price") from amounts collected by Purchaser or any Seller on or after the Closing in respect of Shared Accounts Receivable, as follows:

(a)     In the event that the balance of Net Shared Accounts Receivable (as reasonably determined by Sellers and Purchaser (in consultation with the First Lien Agent) at Closing) is greater than or equal to Thirty Million U.S. Dollars ($30,000,000):

(i)      fifty percent (50%) of the aggregate amount of collected Shared Accounts Receivable shall be for the benefit of Sellers (or their designee(s)) and the other fifty percent (50%) of the aggregate amount of such collected Shared Accounts Receivable shall be for the benefit of Purchaser until a total of Ten Million U.S. Dollars ($10,000,000) of Shared Accounts Receivable has been collected;

(ii)     after a total of Ten Million U.S. Dollars ($10,000,000) of Shared Accounts Receivable has been collected, seventy percent (70%) of the aggregate amount of such collected Shared Accounts Receivable shall be for the benefit of Sellers (or their designee(s)) and the remainder shall be for the benefit of Purchaser until a total of Twenty Million U.S. Dollars ($20,000,000) of Shared Accounts Receivable has been collected; *and*

(iii)    after a total of Twenty Million U.S. Dollars ($20,000,000) of Shared Accounts Receivable has been collected, sixty percent (60%) of the aggregate amount of such collected Shared Accounts Receivable shall be for the benefit of Sellers (or their designee(s)) and the remainder shall be for the benefit of Purchaser until an amount equal to the Net Shared Accounts Receivable has been collected.

12

(b)      In the event that the balance of Net Shared Accounts Receivable (as reasonably determined by Sellers and Purchaser (in consultation with the First Lien Agent) at Closing) is less than Thirty Million U.S. Dollars ($30,000,000):

(i)      fifty percent (50%) of the aggregate amount of collected Shared Accounts Receivable shall be for the benefit of Sellers (or their designee(s)) and the other fifty percent (50%) of the aggregate amount of such collected Shared Accounts Receivable shall be for the benefit of Purchaser until a total of Ten Million U.S. Dollars ($10,000,000) of Shared Accounts Receivable has been collected; *and*

(ii)      after a total of Ten Million U.S. Dollars ($10,000,000) of Shared Accounts Receivable have been collected, Purchaser shall be entitled to receive the percentage of the aggregate Net Shared Accounts Receivable obtained by dividing (A) Seven Million U.S. Dollars ($7,000,000) by (B) the difference of Net Shared Accounts Receivable *minus* Ten Million U.S. Dollars ($10,000,000), and the remainder shall be for the benefit of Sellers (or their designee(s)) until an amount equal to the Net Shared Accounts Receivable has been collected.

Each Friday of each calendar week following the Closing Date until all Shared Accounts Receivable has been collected in full, commencing as of May 1, 2019 and continuing weekly thereafter, Sellers shall prepare and deliver to Purchaser a weekly written report (each a "Collected Accounts Receivable Report") setting forth the calculation of all Accounts Receivable collected by any Seller during the preceding seven (7) days (or the applicable number of days of the respective reporting period) and shall deliver all such amounts of Accounts Receivable collected by any Seller during such period to Purchaser by wire transfer of immediately available funds not more than one (1) business day thereafter and, in any week where the last day of the month occurs, the weekly Collected Accounts Receivable Report shall be prepared on the day of the that week that is two (2) days prior to the end of such calendar month (or if a weekend, the Friday prior) and all Shared Accounts Receivable collected by any Seller for such reporting period shall be delivered to Purchaser by wire transfer of immediately available funds not later than one (1) business day thereafter and, in any event, on or before the last day of the respective calendar month.

Within one (1) week after receiving any Collected Accounts Receivable Report from Sellers, Purchaser shall (i) deliver to the First Lien Agent and Sellers a supplement to the Collected Accounts Receivable Report setting forth information regarding the amount of Shared Accounts Receivable collected by Purchaser during such period and (ii) pay to Sellers (or their designee(s)) the Contingent Payments owing to Sellers (or their designee(s)) (net of any Shared Accounts Receivable amounts collected by any Seller and not remitted to Purchaser in accordance with this section, as set forth on the Collected Accounts Receivable Report).

For avoidance of doubt, all Accounts Receivable attributable to and collected by any Seller or Purchaser attributable to periods on or after May 1, 2019, shall be entirely for the benefit of Purchaser ("Unshared Accounts Receivable") and any Unshared Accounts Receivable collected by any Seller shall be calculated on the Collected Accounts Receivable Report and remitted and paid over by Sellers to Purchaser as described above.

In furtherance of the foregoing, after the Closing Date and until all of the Shared Accounts Receivable has been collected, Purchaser covenants to, and shall cause its Affiliates to, (i)

13

diligently collect all Shared Accounts Receivable of the Business in the Ordinary Course of Business and pursue the payment thereof, (ii) hold an applicable percentage of cash received from such collections of Shared Accounts Receivable in trust for the benefit of Sellers and the First Lien Agent, and (iii) not take any action or fail to take any action with the intent of, or that is reasonably likely to have the effect of, reducing the amount of any Contingent Payment (including, without limitation, discounting, forgiving, writing off, settling or otherwise compromising any Shared Accounts Receivable) (A) without the prior written consent of the First Lien Agent and Sellers or (B) in a manner which is not in the ordinary course of business and consistent with the past practice of the Business.

From time to time after the Closing Date, Sellers and the First Lien Agent and their designated representatives shall, upon reasonable notice to Purchaser, have the right, not more than once per month, at reasonable times and during normal business hours, to examine the books and records of Purchaser to verify the accuracy of any Contingent Payment made under or pursuant to this Agreement. If Sellers or the First Lien Agent conclusively establish any underpayment of a Contingent Payment made under or pursuant to this Agreement in connection with any such examination and Purchaser agrees in good faith with such finding, Purchaser shall remit such underreported amounts to the First Lien Agent and reimburse the full cost incurred by Sellers or the First Lien Agent for such examination.

For purposes of calculating the Accounts Receivable collected by any Seller from time to time after the Closing Date, Purchaser and its designated representatives shall, upon reasonable notice to Sellers, have the right, not more than once per week, at reasonable times and during normal business hours, to examine the books and records of any Seller to verify the accuracy of any amounts of Accounts Receivable collected by any Seller and/or the calculation of any Collected Accounts Receivable Report made under or pursuant to this Agreement. Upon request, Sellers shall provide Purchaser with view access to any of Sellers' bank accounts to which customers have been directed by any Seller to pay Accounts Receivable. If Purchaser conclusively establish any underreporting of collected Accounts Receivable made under or pursuant to this Agreement in connection with any such examination and Sellers and the First Lien Agent agree in good faith with such finding, Sellers (or their designee(s)) shall remit such underreported amounts to Purchaser and reimburse the full cost incurred by Purchaser for such examination.  Purchaser shall have the right to offset any amount underreported and any associated costs of an examination from any Contingent Payments remaining due and payable.

   Section 3.4 <u>Allocation of Purchase Price</u>. Within ninety (90) days following the Closing Date, Purchaser shall deliver to Sellers a statement allocating the Purchase Price among the Purchased Assets in accordance with Section 1060 of the Code.

**ARTICLE IV**
**BANKRUPTCY COURT APPROVAL**

   Section 4.1 <u>Entry of Order Approving Sale</u>.

   (a) Sellers shall use their reasonable best efforts to obtain entry of an order of the Bankruptcy Court, substantially in the form attached as Exhibit A, approving the sale on the terms of this Agreement on a date not later than April 30, 2019.

14

(b)        In the event that the Bankruptcy Court enters an order approving an offer to purchase all or substantially all of the Purchased Assets submitted by a party other than Purchaser either (i) prior to the termination of this Agreement or (ii) within thirty (30) days after the termination of this Agreement by (A) Purchaser pursuant to Sections 12.2(b) or (B) by Sellers pursuant to Section 12.2(d) or Section 12.2(e), then no later than the closing of the sale of any Purchased Assets to a third party, Sellers shall pay to Purchaser from the proceeds of such sale a breakup fee in an amount of Two Hundred and Fifty Thousand U.S. Dollars ($250,000) plus an expense reimbursement up to a maximum amount of Five Hundred Thousand U.S. Dollars ($500,000).

(c)        Sellers shall provide notice to Purchaser of any hearing on the motion to approve the Sale Order or any other matter before the Bankruptcy Court relating to this Agreement or the Transaction Documents, in each case as required by the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure and the Local Bankruptcy Rules for the Southern District of New York or as otherwise ordered by the Bankruptcy Court.

(d)        Purchaser agrees that it will take such actions as are reasonably requested by Sellers to assist in obtaining entry by the Bankruptcy Court of the Sale Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for purposes, among others, of: (i) demonstrating that Purchaser is a "good faith" purchaser; and (ii) establishing "adequate assurance of future performance" within the meaning of section 365 of the Bankruptcy Code.

Section 4.2    Certain Bankruptcy Undertakings by Sellers and Purchaser.

(a)        On or before April 18, 2019, Sellers shall file the Sale Motion.  Except as ordered by the Bankruptcy Court or to the extent each Seller's board of directors or equivalent governing body reasonably determines in good faith, in consultation with outside counsel, that taking such action, or refraining from taking such action, as applicable, is required to comply with applicable law or its fiduciary obligations under applicable law, Sellers shall neither take any action, nor fail to take any action, which action or failure to act would reasonably be expected to (i) prevent or impede the consummation of the transactions contemplated by this Agreement in accordance with the terms of this Agreement, or (ii) result in (A) the reversal, avoidance, revocation, vacating or modification (in any manner that would reasonably be expected to materially and adversely affect Purchaser's rights hereunder) of the Sale Order, or (B) the entry of a stay pending appeal.  Furthermore, Purchaser shall neither take any action, nor fail to take any action, which action or failure to act would reasonably be expected to prevent or impede the consummation of the transactions contemplated by this Agreement in accordance with the terms of this Agreement.

(b)        If the Sale Order or any other order of the Bankruptcy Court relating to this Agreement shall be appealed by any Person (or a petition for certiorari or motion for rehearing or reargument shall be filed with respect thereto), Sellers, with the cooperation and support of Purchaser, shall take all steps as may be reasonable and appropriate to defend against such appeal, petition or motion, and shall endeavor to obtain an expedited resolution of such appeal.

EAST\166026559.2
US_138623865v13_392525-00029 4/18/2019 4:07 PM

## ARTICLE V
## INSTRUMENTS OF TRANSFER AND ASSUMPTION

Section 5.1    Transfer Documents.  At the Closing, each Seller, as applicable, will deliver to Purchaser (a) one or more Bills of Sale in form and substance reasonably satisfactory to Purchaser and Sellers (the "Bill of Sale"), and (b) all such other good and sufficient instruments of sale, transfer and conveyance consistent with the terms and provisions of this Agreement, including, without limitation, an assignment of the Intellectual Property in form and substance reasonably satisfactory to Purchaser and Sellers (the "Intellectual Property Assignment Agreement") and any other assignments as shall be reasonably necessary to vest in Purchaser all of each Seller's right and title to, and interest in, the Purchased Assets.

Section 5.2    Assignment and Assumption Documents.  At the Closing, Purchaser and each Seller, as applicable, will execute and deliver an Assignment and Assumption Agreement in form and substance reasonably satisfactory to Purchaser and Sellers (the "Assumption Agreement") in order to effect the assignment and assumption of the Assumed Liabilities.

## ARTICLE VI
## CLOSING

Section 6.1    Closing Date.  Subject to the terms and conditions hereof, the closing of the transactions contemplated by this Agreement (the "Closing") shall take place via email, at the offices of Katten Muchin Rosenman LLP, 575 Madison Avenue, New York, NY 10022, or at such other location as may be mutually agreed upon among the parties hereto on the date which is not later than the date that is one (1) Business Day after the date on which all conditions to Closing set forth in Articles X and XI have been satisfied (or waived) or such later date as the parties mutually agree in writing (the "Closing Date").  The Closing shall be effective as of 12:01 a.m. Eastern Time on the Closing Date.

## ARTICLE VII
## SELLERS' REPRESENTATIONS AND WARRANTIES

Each Seller represents and warrants to Purchaser that the statements contained in this Article VII are true and correct as of the date of this Agreement, subject to the disclosures and exceptions set forth in the Disclosure Schedules attached hereto:

Section 7.1    Organization, Qualification and Corporate Power.  Each Seller is a company duly organized, validly existing and in good standing under the Laws of the state or country of its formation and is in good standing under the Laws of each jurisdiction where such qualification is required, except where the lack of such qualification would not reasonably be expected to have a Material Adverse Effect.  Each Seller has all necessary power and authority to own and operate its properties and to carry on its business as it is now being conducted.  Subject to entry of the Sale Order, each Seller has the power and authority to execute and deliver and perform its obligations under this Agreement and the other Transaction Documents, and to undertake the transactions contemplated hereby and thereby.  As used herein, the term "Transaction Documents" means this Agreement and all other agreements, documents and instruments executed in connection herewith

or required to be executed and/or delivered by any Seller in accordance with the provisions of this Agreement.

Section 7.2    Authorization, Execution and Delivery of Agreement and Transaction Documents.  Subject to entry of the Sale Order, the execution, delivery and performance of this Agreement and the other Transaction Documents by each Seller and the transfer or assignment of the Purchased Assets to Purchaser have been duly and validly authorized and approved by all necessary corporate action.  Subject to entry of the Sale Order and pursuant thereto, each Seller will have full power, right and authority to sell and convey to Purchaser the Purchased Assets owned by such Seller.

Section 7.3    Title to Assets; Subsidiaries.  Collectively, Sellers have title to, or a valid leasehold interest in, all of the properties and assets included in the Purchased Assets, and subject to entry of the Sale Order and upon the consummation of the transactions contemplated hereby and by the Transaction Documents, Purchaser will acquire title to all of the Purchased Assets, free and clear of all Liens. Sizmek DSP is the sole direct owner of the DSP Direct Subsidiaries and the sole owner of the DSP Indirect Subsidiaries.

Section 7.4    Legal Proceedings.  Except for the Bankruptcy Case and as otherwise set forth on Schedule 7.4, there is no Legal Proceeding pending or, to the Knowledge of Sellers, threatened in writing against any Seller or the Purchased Assets (or to the Knowledge of Sellers, pending or threatened, against any of the officers, directors or employees of any Seller with respect to their business activities related to the Purchased Assets) (a) that as of the date hereof challenges or that as of the date hereof is reasonably expected to have the effect of preventing, making illegal, delaying or otherwise interfering with any of the transactions contemplated by this Agreement; or (b) that is related to the Purchased Assets to which any Seller is otherwise a party.

Section 7.5    Real Property.  No Seller owns any real property.  Schedule 7.5 sets forth the street addresses of all real property used or held for use in the Business which any Seller leases, operates, occupies or subleases in connection with the Business or upon which any tangible Purchased Assets are located and all instruments, easements, leases, subleases, options and other material agreements (including all amendments thereto) creating any interest or right in any Seller or any other party in any of the real property specifying the name of the lessor or sublessor (as applicable).

Section 7.6    No Violation of Laws or Agreements.  Subject to order of the Bankruptcy Court, the execution and delivery by each Seller of this Agreement and the Transaction Documents contemplated hereby, the performance by each Seller of its obligations hereunder and thereunder and the consummation by each Seller of the transactions contemplated herein and therein will not violate, (i) any Laws or any judgment, decree, order, regulation or rule of any court or Governmental Authority to which any Seller is subject; (ii) result in any breach of, or constitute a default (or event which with the giving of notice or lapse of time, or both, would become a default) under, or give to any Person any rights of termination, amendment, acceleration or cancellation of, or result in the creation of any Lien on any of the Purchased Assets, any note, bond, mortgage, indenture, contract, agreement, lease, license, permit, franchise or other instrument to which any Seller is a party and which relates to any of the Purchased Assets; or (iii) contravene, conflict with or result in a violation of any provision of any organizational documents of any Seller, except in

17

the cases of clauses (i) and (ii) above, for such violations which would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

Section 7.7   Employee Benefits; ERISA Matters.   Sellers have made available to Purchaser summaries of all material Employee Plans covering employees, directors or consultants or former employees, directors or consultants in, or related to, the Business.  Sellers have made available to Purchaser true and complete summaries of all such material Employee Plans, including summaries of written descriptions thereof which have been distributed to Sellers' employees and for which Sellers have copies, all annuity contracts or other funding instruments relating thereto, and a summary description of all Employee Plans which are not in writing.  To the Knowledge of Sellers, no Seller nor any ERISA Affiliate (as defined in ERISA) has incurred any liability with respect to any Employee Plan of Sellers, which may create, or result in any liability to Purchaser.

Section 7.8   Labor Matters.   Except as set forth on Schedule 7.8 and except for "at-will" offer letters that do not contain post-termination obligation on Sellers, there are no employment, consulting, severance or indemnification contracts between a Seller and any of its employees. Each Seller (i) is not party to or bound by any collective bargaining or similar agreement with any labor organization; (ii) has no employees that are represented by any labor organization; and (iii) has no Knowledge of any union organizing activities among the employees of any Seller.

Section 7.9   Brokers.   Except for those set forth in Schedule 7.9, for whom Sellers shall be solely responsible for any fees or commissions owing, each Seller has not engaged any agent, broker or other Person acting pursuant to the express or implied authority of such Seller which is or may be entitled to a commission or broker's or finder's fee in connection with the transactions contemplated by this Agreement or otherwise with respect to the sale of the Purchased Assets.

Section 7.10   Permits.   Each Seller is and at all times has been in compliance in all material respects with all permits applicable to it, or applicable to the conduct and operations of the Business, or relating to or affecting the Purchased Assets.  Each Seller has not received any written notice from any Governmental Authority specifically alleging (i) any actual, alleged, possible or potential material violation of, or failure to comply with, any such permits or (ii) any actual, alleged, possible or potential revocation, withdrawal, suspension, cancellation or termination of, or any modification to, any permit.

Section 7.11   Taxes; Tax Returns.   No Seller has received any outstanding notice of audit, and is not undergoing any audit, of Tax Returns relating to the Business and has never received any written notice of deficiency or assessment from any taxing authority with respect to liability for Taxes relating to the Business which has not been fully paid or finally settled.  Each Seller has complied in all material respects with all applicable Laws, rules and regulations relating to the payment and withholding of Taxes and has withheld all amounts required by law to be withheld from the wages or salaries of employees and independent contractors of the Business and is not liable for any Taxes with respect to the employees and independent contractors of the Business for failure to comply with such laws, rules and regulations.

Section 7.12   Compliance with Laws.   Each Seller and the conduct of the Business are and at all times have been in compliance in all material respects with all Laws applicable to them or to the conduct and operations of the Business or relating to the Purchased Assets.  Except as set

EAST\166026559.2
US_138623865v13_392525-00029 4/18/2019 4:07 PM

forth on Schedule 7.12, no Seller has received any written notice to the effect that, or otherwise been advised of, and to the Knowledge of Sellers there has not occurred with respect to the Purchased Assets or the Business, (a) any actual, alleged, possible or potential violation of, or failure to comply with, any such Laws, or (b) any actual, alleged, possible or potential obligation on the part of any Seller to undertake, or to bear all or any portion of the cost of, any remedial action of any nature.

## ARTICLE VIII
## PURCHASER'S REPRESENTATIONS

Purchaser represents and warrants to each Seller that the statements contained in this Article VIII are true, correct and complete as of the date of this Agreement.

Section 8.1    Organization; Qualification and Corporate Power.    Purchaser is a corporation duly organized, validly existing and in good standing under the Laws of the State of Delaware.  Purchaser has all necessary power and authority to (a) own and operate its properties and carry on its business as it is now being conducted, (b) perform its obligations under this Agreement and the other Transaction Documents, and to undertake and carry out the transactions contemplated hereby and thereby, and (c) own the Purchased Assets.

Section 8.2    Authorization, Execution and Delivery of Agreement and Transaction Documents.    All necessary consents and approvals have been obtained by Purchaser for the execution and delivery of this Agreement and the Transaction Documents.  The execution, delivery and performance of this Agreement and the other Transaction Documents in accordance with their terms by Purchaser have been duly and validly authorized and approved by all necessary corporate action.  Purchaser has full power, right and authority to acquire the Purchased Assets.  This Agreement is, and each of the other Transaction Documents when so executed and delivered will be, a valid and binding obligation of Purchaser, enforceable against it in accordance with its terms, except to the extent such enforceability may be limited by bankruptcy, insolvency or other similar laws affecting creditors.

Section 8.3    Brokers.    Purchaser has not engaged any agent, broker or other Person acting pursuant to the express or implied authority of Purchaser which is or may be entitled to a commission or broker's or finder's fee in connection with the transactions contemplated by this Agreement or otherwise with respect to the sale of the Purchased Assets.

Section 8.4    No Violation of Laws or Agreements.    The performance by Purchaser of its obligations contemplated hereunder and the consummation by Purchaser of the transactions contemplated herein will not violate, (i) any Laws or any judgment, decree, order, regulation or rule of any court or Governmental Authority to which Purchaser is subject; or (ii) contravene, conflict with or result in a violation of any provision of any organizational documents of Purchaser.

Section 8.5    Purchaser Experience.    Purchaser is experienced and sophisticated with respect to transactions of the type contemplated by this Agreement.  In consultation with experienced counsel and advisors of its choice, Purchaser has conducted its own independent review and analysis of the Purchased Assets, the Assumed Liabilities and the rights and obligations it is acquiring and assuming under the Transaction Documents.  Purchaser acknowledges that it

and its representatives have been permitted such access to the books and records, Contracts and other properties related to the Purchased Assets as it required to complete its review.

Section 8.6    <u>Legal Proceedings</u>.   There is no Legal Proceeding pending or, to the knowledge of Purchaser, threatened in writing against Purchaser or any of the officers, directors or employees of Purchaser that as of the date hereof challenges or that as of the date hereof is reasonably expected to have the effect of preventing, making illegal, delaying or otherwise interfering with any of the transactions contemplated by this Agreement.

Section 8.7    <u>Stock Consideration</u>. The Stock Consideration to be issued hereunder has been duly authorized and when issued will be valid and legally issued, fully paid and nonassessable, and, other than Liens and restrictions contained in Zeta Global Holdings Corp. Certificate of Incorporation as amended and as may be further amended from time to time, its amended and restated stockholders' agreement, its amended and restated registration rights agreement or its senior debt facilities, free and clear of Liens (other than restrictions on transfer or pursuant to applicable securities Laws) and not in violation of any preemptive or similar rights or any applicable securities Laws.

Section 8.8    <u>Adequate Assurances Regarding Assumed Contracts</u>.   As of the Closing, Purchaser will have sufficient funds available to deliver the Closing Cash Payment to Sellers and will be capable of satisfying the conditions contained in Sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to the Assumed Contracts.

## ARTICLE IX
## SELLERS' AND PURCHASER'S COVENANTS AND AGREEMENTS

Section 9.1    <u>Conduct of Business</u>.   Except as otherwise expressly contemplated by this Agreement or with the prior written consent of Purchaser or except as described on <u>Schedule 9.1</u>, from the date hereof until the Closing Date, each Seller shall use commercially reasonable efforts to preserve the Purchased Assets.  Without limiting the generality of the foregoing, each Seller will, other than in the Ordinary Course of Business or with Purchaser's written consent, refrain from doing any of the following in respect of the Purchased Assets: (i) disposing of or transferring any Purchased Asset, (ii) transferring any tangible Purchased Asset to any other location to the extent that such other location is not otherwise part of the Purchased Assets, or (iii) except as otherwise provided or required in this Agreement, terminating, amending or modifying the material terms of any of the Assumed Contracts; <u>provided</u>, <u>however</u>, notwithstanding anything to the contrary in the preceding sentence, each Seller may, in its reasonable discretion, take such actions in connection with or as a result of the consequences (adverse or otherwise) of filing the Bankruptcy Case.

Section 9.2    <u>Mutual Covenants</u>.   The parties hereto mutually covenant (subject to the other terms of this Agreement):

(a)    from the date of this Agreement to the Closing Date, to cooperate with each other in determining whether filings are required to be made or consents (including any Required Consents) are required to be obtained in any jurisdiction in connection with the consummation of the transactions contemplated by this Agreement and in making or causing to be made any such

filings promptly and in seeking to timely obtain any such consents including any Required Consents (it being understood that each party hereto shall furnish to the other and to the other's counsel all such information as may be reasonably required in order to effectuate the foregoing action), which consents shall not, in any event, include any consent the need for which is obviated by the Sale Order or otherwise by the provisions of the Bankruptcy Code; and

(b)    from the date of this Agreement to the Closing Date, to advise the other parties promptly if such party determines that any condition precedent to its obligations hereunder will not be satisfied in a timely manner.

Section 9.3    <u>Access to Information</u>.  Prior to and through the date on which the Closing occurs or this Agreement is terminated, Purchaser shall be permitted to discuss Purchaser's entering into this Agreement and its intent to acquire the Purchased Assets subject to the approval of the Bankruptcy Court with current customers, vendors and other key stakeholder of the Business and each Seller shall, and shall cause its subsidiaries to, cooperate with Purchaser and shall give Purchaser and its representatives (including Purchaser's accountants, consultants, counsel and employees), upon reasonable notice and during normal business hours, full access to the properties, contracts, customers, vendors, leases, equipment, employees, affairs, books, documents, records and other information of such Seller to the extent relating to the Business, the Purchased Assets, Assumed Liabilities, and any other aspect of this Agreement and shall cause their respective officers, employees, agents and representatives to furnish to Purchaser all available documents, records and other information (and copies thereof), to the extent relating to the Purchased Assets, Assumed Liabilities, and any other aspect of this Agreement, in each case, as Purchaser may reasonably request. Notwithstanding anything herein to the contrary, no such investigation or examination shall be permitted to the extent that it would require any Seller or subsidiary of any Seller to disclose information subject to attorney-client privilege or conflict with any confidentiality obligations to which any Seller is bound.

Section 9.4    <u>Public Announcement</u>.  Subject to the provisions of the Bankruptcy Code and each Seller's right to make such filings, disclosures, and statements as it in good faith deems necessary or appropriate in connection with the Bankruptcy Case, no party hereto shall make or issue, or cause to be made or issued, any public announcement or written statement concerning this Agreement or the transactions contemplated hereby without making reasonable and good faith efforts to consult with and seek input from the other parties hereto prior to release about the content of any such announcement or statement or unless counsel to such party advises that such announcement or statement is required by law (such as an obligation to disclose under federal securities laws of the United States) (in which case the parties hereto shall make reasonable efforts to consult with each other prior to such required announcement).

Section 9.5    <u>Preservation of Records</u>.  From and after the Closing Date, upon request by any Seller, Purchaser will permit such Seller and its representatives to have reasonable access during normal business hours, and in a manner so as not to interfere unreasonably with the normal business operations of Purchaser, to all premises, properties, personnel, books and records, contracts, and documents of or related to the Purchased Assets or the Assumed Liabilities for the purposes of (a) preparing any Tax Returns, (b) enforcing rights or obligations of such Seller under this Agreement or any of the Transaction Documents, or (c) complying with the requirements of, or responding to inquiries by, any Governmental Authority; <u>provided</u>, <u>however</u>, that, for the

21

avoidance of doubt, the foregoing shall not require Purchaser to take any such action if (i) such action may result in a waiver or breach of any attorney/client privilege or conflict with any confidentiality obligations to which Purchaser is bound, or (ii) such action could reasonably be expected to result in violation of applicable law or order.  Purchaser agrees to maintain the files or records which are contemplated by the first sentence of this <u>Section 9.5</u> for six (6) years following the Closing Date.

Section 9.6    <u>Taxes</u>.

(a)    Sellers shall be responsible for all income and property Taxes of Sellers in connection with, relating to or arising out of the Business, the Excluded Assets, the Excluded Liabilities or the ownership of the Purchased Assets, or the Assumed Liabilities attributable to taxable periods, or portions thereof, ending before the earlier of the Closing Date and May 1, 2019, which Taxes shall be an Excluded Liability.  All state and local sales and use Taxes, to the extent attributable to periods prior to the earlier of the Closing Date and May 1, 2019, shall be paid or otherwise discharged by Sellers.

(b)    Purchaser shall be responsible for (and shall indemnify and hold harmless each Seller and its directors, officers, employees, Affiliates, agents, successors and permitted assigns against) any sales, use, stamp, documentary stamp, filing, recording, transfer or similar fees or taxes or governmental charges (including any interest and penalty thereon) payable in connection with the transactions contemplated by this Agreement ("<u>Transfer Taxes</u>").  To the extent that any Transfer Taxes are required to be paid by Sellers (or such Transfer Taxes are assessed against Sellers), Purchaser shall promptly reimburse Sellers in cash, as applicable, for the full amount of such Transfer Taxes.  Sellers and Purchaser shall cooperate and consult with each other prior to filing any Tax Returns in respect of Transfer Taxes.  Sellers and Purchaser shall cooperate and otherwise take commercially reasonable efforts to obtain any available refunds for Transfer Taxes.

(c)    Each Seller and Purchaser shall (i) provide such assistance as may reasonably be requested by any of them in connection with the preparation of any Tax Return, any audit or other examination by any taxing authority or any judicial or administrative proceeding with respect to Taxes, (ii) retain and provide the other with any records or other information which may be relevant to such return, audit, examination or proceeding, and (iii) provide the other with any final determination of any such audit or examination proceeding or determination that affects any amount required to be shown on any Tax Return of the other for any period (which shall be maintained confidentially).

Section 9.7    <u>Good Faith Efforts</u>.  Without limiting the specific obligations of any party hereto under any covenant or agreement hereunder, each party hereto shall, and shall cause its Affiliates to, use its good faith efforts to take all action and do all things necessary to consummate the transactions contemplated in this Agreement as soon as reasonably practicable; provided, however, that (w) no party hereto or its Affiliates shall be required to make any concessions that would adversely affect its business or be materially more burdensome to such party (including to amend any contract to increase the amount payable thereunder, commence any litigation, settle or compromise any matter, offer or grant any accommodation (financial or otherwise) to any third party or Governmental Authority, pay any amount or bear any other incremental economic burden

22

to obtain any consent or order or to effect the assignment or transfer of a Purchased Asset), (x) no party hereto or its Affiliates shall incur any expense that would be payable or otherwise borne by another party hereto or such other party's Affiliates without the consent of such other party, (y) no Seller shall make any concessions that would purport to bind the Business from and after the Closing or be an Assumed Liability and (z) Purchaser shall not make any concessions that would purport to bind any Seller or any of their Affiliates (the conditions set forth in the foregoing clauses (w) – (z), the "Efforts Conditions").

Section 9.8    Employees.

(a)    Subject to and in accordance with the provisions of this Section 9.8 and applicable law, Purchaser shall, or shall cause one of its Affiliates to, effective upon the Closing, offer employment to certain employees who are employed by Sellers or any Target Subsidiary as of the Closing, identified in writing by Purchaser to Sellers any time on or before one (1) business day prior to the Closing Date; provided that such list shall include no less (but may include more) than one hundred eighty (180) Employees.  Purchaser or its Affiliate, as the case may be, shall employ all of the Employees who accept such offer.  Employees who accept such offers and become either full-time or part-time employees of Purchaser, or its Affiliate, upon the Closing are hereinafter referred to as "Transferred Employees."  Each Seller shall use reasonable commercial efforts to assist Purchaser in securing the employment of the Employees.

(b)    The employment of each Transferred Employee by Sellers shall end effective as of the close of business on the day before the Closing Date and the employment of the Transferred Employees by Purchaser shall commence at or after 12:01 a.m. on the Closing Date or as otherwise provided by law.

Section 9.9    Further Assurances; Transition Services.

(a)    From time to time after the Closing and without further consideration, Purchaser and each Seller, at the request of any other party hereto, will, and will cause its Affiliates to, execute and deliver such other instruments of conveyance and transfer or other instruments or documents and take or arrange for such other actions, as may reasonably be required to effect any of the transactions contemplated by this Agreement or to provide any party hereto with the benefits intended to be conferred and conveyed by this Agreement; provided that, notwithstanding anything to the contrary in this Section 9.9 or any other provision of this Agreement, neither Purchaser nor any Seller nor their respective Affiliates shall be required to execute any document or take any action that would (i) increase the liability or obligation of the party of whom such document or action is requested beyond that which such party would have pursuant to the other provisions of this Agreement, (ii) require or cause the party of whom such action or document is requested to initiate, join in or otherwise become a party to any Legal Proceeding, or (iii) cause such party to incur any material cost or expense that is not already imposed upon it by another provision of this Agreement.

(b)    Sellers shall provide to Purchaser certain transition services as mutually agreed upon by Sellers and Purchaser on or prior to Closing, including technology infrastructure, software and other services required to manage and operate the Business as presently conducted for a fee equal to one hundred and ten percent (110%) of cost to Sellers; provided that, Sellers shall

23

only provide such transition services so long as they are in existence and are able to, and own the assets necessary to, provide such services.

Section 9.10    Confidentiality.

(a)    Each party hereto acknowledges that it currently has and will directly or indirectly disclose Confidential Information to each other party hereto in the course of negotiation of and performance of this Agreement.  All such Confidential Information disclosed hereunder shall remain the sole property of the disclosing party (or other third party), and the receiving party shall have no interest in, or rights with respect thereto, except as set forth herein.  For avoidance of doubt, any Confidential Information of Sellers relating to the Purchased Assets and the Assumed Contracts shall be deemed to be Confidential Information of Purchaser as of the Closing ("Deemed Purchaser Confidential Information"), notwithstanding the fact that Sellers or any of their respective officers, directors, employees or representatives have knowledge of such Deemed Purchaser Confidential Information obtained prior to the negotiation and performance of this Agreement.  Each party hereto agrees to treat such Confidential Information with the same degree of care and security as it treats its Confidential Information and, in any event, no less degree of care and security than a reasonably prudent business person would utilize to protect from disclosure and keep confidential its Confidential Information.  Each party hereto may disclose such Confidential Information only to those employees and agents who require such knowledge to perform services under this Agreement and each party hereto shall be liable for the acts of such employees and agents in breach of this Section 9.10.  Except as otherwise contemplated by this Agreement, no party hereto shall disclose the Confidential Information of any other party hereto to any third party without the prior written consent of the disclosing party, and the duty of confidentiality created by this section shall survive any termination of the Agreement for a period of one (1) year.

(b)    As used herein, "Confidential Information" means all information or data relating to any party hereto and its affiliates, operations, employees, products or services, clients, customers or potential customers.  Confidential Information shall include: (i) internal business information (including historical and projected financial information and budgets and information relating to strategic and staffing plans and practices, business, training, marketing, promotional and sales plans and practices, cost, rate and pricing structures and accounting and business methods); (ii) identities of, individual requirements of, specific contractual arrangements with, and information about, suppliers, distributors, customers, independent contractors or other business relations and their confidential information; (iii) trade secrets, know-how, compilations of data and analyses, techniques, systems, formulae, recipes, research, records, reports, manuals, documentation, models, data and data bases relating thereto; (iv) inventions, innovations, improvements, developments, methods, designs, analyses, drawings, reports and all similar or related information (whether or not patentable); and (v) the terms and conditions of this Agreement.  Information shall not be considered Confidential Information to the extent, but only to the extent, that such information is: (A) is already lawfully known to the receiving party as of the Closing Date as evidenced by reasonable documentary proof, free of any restriction at the time it is obtained; (B) subsequent to the Closing Date is learned of by the receiving party from an independent third party free of any restriction and without breach of this Agreement; (C) becomes publicly available through no wrongful act of or breach of this Agreement by the receiving party;

(D) independently developed by the receiving party without reference or access to any Confidential Information of the disclosing party; or (E) required to be disclosed by law.

Section 9.11    Survival of Representations and Warranties.  None of the representations and warranties of Sellers or Purchaser contained in this Agreement or made in any other documents or instruments delivered pursuant to this Agreement shall survive the Closing hereunder other than the representations and warranties of Purchaser in Section 8.7 which shall survive the Closing for a period of twelve (12) months.

Section 9.12    "AS IS" Transaction; Disclaimer of Implied Warranties.  Except as expressly provided in Article VII above, Purchaser hereby acknowledges and agrees that each Seller makes no representations or warranties whatsoever, express or implied, with respect to any matter relating to the Purchased Assets including income to be derived or expenses to be incurred in connection with the Purchased Assets, the physical condition of any personal property comprising a part of the Purchased Assets or which is the subject of any Assumed Contract, the value of the Purchased Assets (or any portion thereof), the transferability of the Purchased Assets, the terms, amount, validity, collectability or enforceability of any Assumed Liabilities, Assumed Contracts, the title of the Purchased Assets (or any portion thereof), the merchantability or fitness of the personal property comprising a portion of the Purchased Assets or any other portion of the Purchased Assets for any particular purpose, or any other matter or thing relating to the Purchased Assets (or any portion thereof).  Without in any way limiting the foregoing, except as otherwise expressly provided in Article VII above, each Seller hereby disclaims any warranty (express or implied) of merchantability or fitness for any particular purpose as to any portion of the Purchased Assets.

Section 9.13    Additional Sellers. At any time after the date hereof or after the entry of the Sale Order by the Bankruptcy Court if Sellers, Purchaser and the First Lien Agent determine it is necessary in order to effectuate the provisions of Section 2.4(c), Sellers shall cause any Target Subsidiary to assign any assets or other rights that are primarily related to or used in connection with the operation of Business to Purchaser or, if prior to Closing, cause such Target Subsidiary to execute a joinder to this Agreement pursuant to which such Target Subsidiary shall become party hereto as a Seller. Sellers and Purchaser hereby acknowledge and agree that any assets or other rights that may be transferred to Purchaser by any Target Subsidiary pursuant to this Section 9.13, if any, have no value and are merely incidental and ancillary to the Purchased Assets being sold to Purchaser by the Debtors under this Agreement, and that no value is, or shall be, ascribed to any such assets or other rights held by any Target Subsidiary.

### ARTICLE X
### CONDITIONS PRECEDENT TO PURCHASER'S OBLIGATION TO CLOSE

The obligation of Purchaser under this Agreement with respect to the purchase and sale of the Purchased Assets shall be subject to the fulfillment on or prior to the Closing of each of the following conditions, any of which may be waived in writing by Purchaser:

Section 10.1    Accuracy of Representations and Warranties; Performance of this Agreement. Each of the representations and warranties made by Sellers shall be true and correct on and as of the date hereof (unless such representation or warranty is given as of a particular date

EAST\166026559.2
US_138623865v13_392525-00029 4/18/2019 4:07 PM

in which case such representation or warranty will be considered only as of such particular date) and at and as of the Closing Date, except for any failure to be so true and correct that, individually or in the aggregate, has not had and would not reasonably be expected to have a Material Adverse Effect.  Each Seller shall have complied with and performed in all material respects all of the agreements and covenants required by this Agreement and each other Transaction Document to be performed or complied with by it on or prior to the Closing.

Section 10.2    Officer's Certificate.   Each Seller shall have delivered to Purchaser a certificate executed by an executive officer of such Seller (including incumbency certificates) as Purchaser may reasonably request in order to evidence compliance with the conditions set forth in Section 10.1.

Section 10.3    Bill of Sale; Assumption Agreement; Intellectual Property Assignment Agreement.   Each Seller shall have delivered to Purchaser an executed Bill of Sale, Assumption Agreement and Intellectual Property Assignment Agreement, as applicable, pursuant to Section 5.1 and Section 5.2 hereof.

Section 10.4    Bankruptcy Matters.   The Sale Order shall have been entered by the Bankruptcy Court.  Such order must be in effect and must not have been reversed or stayed or modified in any material respect.

Section 10.5    Required Consents.  Purchaser shall have received all Required Consents set forth on Schedule 10.5 hereto.

Section 10.6    Joinder and Subscription Agreement.    The First Lien Agent or its designee(s) shall have delivered an executed joinder and subscription Agreement pursuant to which the First Lien Agent or its designee(s) shall have joined as a shareholder Purchaser's amended and restated stockholders' agreement and Purchaser's amended and rested registration rights agreement and subscripted for the purchase of the Stock Consideration (the "Joinder and Subscription Agreement").

Section 10.7    No Material Adverse Effect.  Since the date of this Agreement, there shall have been no Material Adverse Effect on the Purchased Assets or the Business.

## ARTICLE XI
## CONDITIONS PRECEDENT TO SELLERS' OBLIGATION TO CLOSE

The obligations of each Seller under this Agreement with respect to the purchase and sale of the Purchased Assets shall be subject to the fulfillment on or prior to the Closing of each of the following conditions, any of which may be waived in writing by Sellers:

Section 11.1    Accuracy of Representations and Warranties; Performance of this Agreement.  Each of the representations and warranties made by Purchaser in this Agreement shall be true and correct on and as of the date hereof (unless such representation or warranty is given as of a particular date in which case such representation or warranty will be considered only as of such particular date) and at and as of the Closing Date, except for any failure to be so true and correct that, individually or in the aggregate, has not had and would not reasonably be expected to have a Material Adverse Effect on the ability of Purchaser to timely consummate the transactions

26

contemplated hereunder (including payment or undertaking the Purchase Price and any other cash payments, fees or expenses contemplated hereby).  Purchaser shall have complied with and performed in all material respects all of the agreements and covenants required by this Agreement and each other Transaction Document to be performed or complied with by it on or prior to the Closing.

Section 11.2    Officer's Certificate.  Purchaser shall have delivered to Sellers a certificate executed by an executive officer of Purchaser (including incumbency certificates) as Sellers may reasonably request in order to evidence compliance with the conditions set forth in Section 11.1.

Section 11.3    Authorizing Resolutions.  Purchaser shall have delivered to Sellers copies of the authorizing resolutions of its Board of Directors authorizing the execution, delivery and performance of this Agreement and the other Transaction Documents and all instruments and documents to be delivered in connection herewith and the transactions contemplated hereby or thereby.

Section 11.4    Assumption Agreement.    Purchaser shall have delivered to Sellers an executed Assumption Agreement pursuant to Section 5.2 hereof.

Section 11.5    Bankruptcy Matters.    The Sale Order shall have been entered by the Bankruptcy Court by not later than April 23, 2019.  Such order must be in effect and must not have been reversed or stayed or modified in any material respect.

Section 11.6    Subscription and Joinder Agreement; Stock Issuance. Purchaser shall have delivered to the First Lien Agent or its designee(s) an executed Joinder and Subscription Agreement, and issued a stock certificate representing the Stock Consideration as provided in the Sale Order.

Section 11.7    Charter Amendment. Purchaser shall have filed a charter amendment in form and substance reasonably satisfactory to Sellers and the First Lien Agent.

Section 11.8    Closing Cash Payment. Purchaser shall have delivered to Sellers (or their designee(s)) an amount equal to the Closing Cash Payment (less any portion of the Closing Cash Payment to be paid by release of the Deposit to Sellers (or their designees)).

# ARTICLE XII
## TERMINATION

Section 12.1    Breaches and Defaults; Opportunity to Cure.  Prior to the exercise by a party of any termination rights afforded under Section 12.2 (b) or Section 12(c)(i) of this Agreement, if any party (the "Non-Breaching Party") believes any other party (the "Breaching Party") to be in breach hereunder, the Non-Breaching Party shall provide the Breaching Party with written notice specifying in reasonable detail the nature of such breach, whereupon if such breach is curable the Breaching Party shall have five  (5) calendar days from the receipt of such notice to cure such breach to the reasonable satisfaction of the Non-Breaching Party.  If the breach is not cured within such time period, then the Non-Breaching Party's sole remedy shall be to terminate this Agreement if the breach is such that the condition set forth in Section 10.1 or Section 11.1, as applicable, shall

EAST\166026559.2
US_138623865v13_392525-00029 4/18/2019 4:07 PM

not be satisfied (as provided in <u>Section 12.2</u>); <u>provided</u>, <u>however</u>, that the Non-Breaching Party shall not be entitled to terminate this Agreement if it is in material breach of this Agreement.

Section 12.2  <u>Termination</u>.  This Agreement may be terminated and the transactions contemplated herein may be abandoned, by written notice given to the other party hereto, at any time prior to the Closing:

(a)  by mutual written consent of Sellers and Purchaser;

(b)  (i) subject to the right to cure set forth in <u>Section 12.1</u>, at any time prior to the Closing Date, by Purchaser if any Seller is in breach of any covenant, representation, undertaking or warranty such that the condition set forth in <u>Section 10.1</u> shall not be satisfied, and Purchaser has not waived such condition in writing on or before the Closing Date or (ii) by Purchaser, if all of the conditions set forth in <u>Article X</u> and <u>Article XI</u> have been satisfied (other than conditions that by their nature are to be satisfied at the Closing) or waived and Sellers fail to consummate the Closing within one (1) business day following the date such conditions have been so satisfied or waived;

(c)  (i) subject to the right to cure set forth in <u>Section 12.1</u>, at any time prior to the Closing Date by Sellers if Purchaser is in breach of any covenant, representation or warranty such that the condition set forth in <u>Section 11.1</u> shall not be satisfied, and Sellers have not waived such condition in writing on or before the Closing Date or (ii) by Sellers, if all of the conditions set forth in <u>Article X</u> and <u>Article XI</u> have been satisfied (other than conditions that by their nature are to be satisfied at the Closing) or waived and Purchaser fails to consummate the Closing within one (1) business day following the date such conditions have been so satisfied or waived;

(d)  at or prior to the Bankruptcy Court hearing regarding approval of this Agreement, by either Sellers or Purchaser, if the Bankruptcy Court enters an order approving an offer to purchase all or substantially all of the Purchased Assets submitted by a party other than Purchaser or enters an order confirming a plan of reorganization of Sellers (other than a plan under which Purchaser acquires the Purchased Assets on or before the Closing Date);

(e)  by written notice from Sellers to Purchaser, if Sellers or the boards of directors (or similar governing bodies) of Sellers determine that proceeding with the transactions contemplated by this Agreement or failing to terminate this Agreement would be inconsistent with its or such Person's or body's fiduciary duties;

(f)  by Sellers or Purchaser on or prior to May 1, 2019 if the Sale Order is not granted on or before April 30, 2019, unless the failure to have the Sale Order granted shall be due to the failure of the party or parties seeking to terminate this Agreement to perform in any material respect its obligations under this Agreement required to be performed by it or them at or prior to April 30, 2019; and

(g)  by Sellers or Purchaser if the Closing shall not have occurred on or before May 15, 2019, unless the failure to have the Closing shall be due to the failure of the party or parties seeking to terminate this Agreement to perform in any material respect its obligations under this Agreement required to be performed by it or them at or prior to the Closing.

28

Section 12.3    Effect of Termination.    In the event of termination of this Agreement pursuant to Section 12.2, this Agreement shall become null and void and, subject to Section 3.2 and Section 4.1(b), there shall be no liability on the part of any party hereto or any of its partners, officers, directors or shareholders; provided that no termination will relieve Purchaser or any Seller, as applicable, from any liability for damages (including damages based on the loss of the economic benefits of the transactions contemplated by this Agreement, including the Cash Purchase Price, to Sellers), losses, costs or expenses (including reasonable legal fees and expenses) resulting from any breach of this Agreement prior to the date of such termination (which, for the avoidance of doubt, will be deemed to include any failure by Purchaser or any Seller to consummate the Closing if and when it is obligated to do so hereunder).

## ARTICLE XIII
## MISCELLANEOUS

Section 13.1    Notices.    All notices and other communications required or permitted to be given hereunder shall be in writing and shall be deemed to have been duly given if delivered personally, sent by electronic mail, recognized overnight delivery service or registered or certified mail, return receipt requested, postage prepaid, to the following addresses:

If to Purchaser:

> c/o Zeta Global Holdings Corp.
> 185 Madison Ave., 5 fl.
> New York, NY 10016
> Attention: Steven Vine, SVP and General Counsel
> E-mail:Svine@zetaglobal.com

with a required copy to:

> DLA PIPER LLP (US)
> 500 8th Street NW
> Washington, DC 20004
> Attention:    Douglas C. Boggs
> Email:        Douglas.Boggs@US.DLAPIPER.com

If to Sellers:

> c/o Sizmek, Inc.
> 401 Park Avenue South
> 5th Floor
> New York, NY 10016

with a required copy to:

> Katten Muchin Rosenman LLP
> 575 Madison Avenue

EAST\166026559.2
US_138623865v13_392525-00029 4/18/2019 4:07 PM

New York, NY 10022
Attention:    Steven J. Reisman and Evan Borenstein
Email:sreisman@kattenlaw.com; evan.borenstein@kattenlaw.com;
            sizmekteam@katten.com

Notices delivered personally shall be effective upon delivery against receipt. Notices transmitted by telecopy shall be effective when received, provided that the burden of proving notice when notice is transmitted by telecopy shall be the responsibility of the party providing such notice. Notices transmitted by electronic mail (with hard copy to follow) shall be effective when sent. Notices delivered by overnight mail shall be effective when received. Notices delivered by registered or certified mail shall be effective on the date set forth on the receipt of registered or certified mail, or seventy-two (72) hours after mailing, whichever is earlier.

Section 13.2   <u>Expenses</u>. Except to the extent that Purchaser is otherwise entitled thereto in accordance with the provisions of this Agreement, each party shall bear its own expenses and costs, including the fees of any attorney retained by it, incurred in connection with the preparation of this Agreement and the consummation of the transactions contemplated hereby.

Section 13.3   <u>Governing Law; Jurisdiction; Waiver of Jury Trial</u>. This Agreement shall be governed by and construed in accordance with the laws of the State of New York (without application of principles of conflict of laws). In connection with any controversy arising out of or related to this Agreement, each Seller and Purchaser hereby irrevocably consents to the exclusive jurisdiction of the Bankruptcy Court, or if, and only if, the Bankruptcy Case declines or may not accept jurisdiction over a particular matter, the United States District Court for the Southern District of New York, or if, and only if, the United States District Court for the Southern District of New York declines or may not accept jurisdiction over a particular matter, the courts of the State of New York. Each of the Sellers and Purchaser irrevocably consents to service of process out of the aforementioned courts and waives any objection which it may now or hereafter have to the laying of venue of any action or proceeding arising out of or in connection with this Agreement brought in the aforementioned courts. EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES, AND SHALL CAUSE ITS SUBSIDIARIES AND AFFILIATES TO WAIVE, ALL RIGHT TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

Section 13.4   <u>Assignment</u>. This Agreement binds and benefits the parties hereto and their respective successors and assignees. Purchaser shall not have the right to assign any of its rights under this Agreement or delegate any performance of its obligations under this Agreement without the prior written consent of Sellers and the First Lien Agent; provided, that Purchaser shall be permitted to assign its rights under this Agreement to Purchaser's wholly owned subsidiary or as may be required for the purposes of granting Purchaser's senior lenders a security interest in the Purchased Assets without Sellers' prior written consent. Each Seller may, with the prior written consent of the First Lien Agent, freely assign its rights hereunder without the consent of (but with notice to) Purchaser.

EAST\166026559.2
US_138623865v13_392525-00029 4/18/2019 4:07 PM

Section 13.5   Successors and Assigns.   All agreements made and entered into in connection with this Transaction shall be binding upon and inure to the benefit of the parties hereto, their successors and permitted assigns.

Section 13.6   Amendments; Waivers.   No alteration, modification or change of this Agreement shall be valid except by an agreement in writing executed by the parties hereto and the First Lien Agent.   Except as otherwise expressly set forth herein, no failure or delay by any party hereto or the First Lien Agent in exercising any right, power or privilege hereunder (and no course of dealing between or among any of the parties hereto) shall operate as a waiver of any such right, power or privilege.   No waiver of any default on any one occasion shall constitute a waiver of any subsequent or other default.   No single or partial exercise of any such right, power or privilege shall preclude the further or full exercise thereof.

Section 13.7   Entire Agreement.   This Agreement (including the Exhibits and Disclosure Schedules which are hereby incorporated by reference into and made a part of this Agreement for all purposes) merges all previous negotiations and agreements between the parties hereto, either verbal or written, and constitutes the entire agreement and understanding between the parties hereto with respect to the subject matter of this Agreement.

Section 13.8   Counterparts.   This Agreement may be executed in two or more counterparts, each of which when so executed shall be an original, but all of which together shall constitute one agreement.   Facsimile and/or PDF signatures shall be deemed original signatures.

Section 13.9   Severability.   If any provision of this Agreement or the application thereof to any Person or circumstance shall be invalid or unenforceable to any extent, the remainder of this Agreement and the application of such provision to other Persons or circumstances shall not be affected thereby and shall be enforced to the greatest extent permitted by law, but only as long as the continued validity, legality and enforceability of such provision or application does not materially (a) alter the terms of this Agreement, (b) diminish the benefits of this Agreement or (c) increase the burdens of this Agreement, for any Person.

Section 13.10   Section Headings.   The section headings contained in this Agreement are solely for the purpose of reference, are not part of the agreement of the parties hereto and shall not in any way affect the meaning or interpretation of this Agreement.

Section 13.11   Interpretation.   As all parties hereto have participated in the drafting of this Agreement, any ambiguity shall not be construed against any party as the drafter.   Unless the context of this Agreement clearly requires otherwise, (a) "or" has the inclusive meaning frequently identified with the phrase "and/or," (b) "including" has the inclusive meaning frequently identified with the phrase "including, but not limited to" and (c) references to "hereof," "hereunder" or "herein" or words of similar import relate to this Agreement.

Section 13.12   Third Parties.   Nothing herein, expressed or implied, is intended to or shall confer on any Person other than the parties hereto any rights, remedies, obligations or liabilities under or by reason of this Agreement, except the First Lien Agent shall be a third party beneficiary of this Agreement.

EAST\166026559.2
US_138623865v13_392525-00029 4/18/2019 4:07 PM

Section 13.13 <u>Specific Performance</u>.  The parties hereto agree that irreparable damage would occur and that the parties hereto and the First Lien Agent would not have any adequate remedy at law in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached.  It is accordingly agreed that each party hereto and the First Lien Agent shall be entitled to an injunction or injunctions to prevent breaches or threatened breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement in the Bankruptcy Court without proof of actual damages or otherwise (and, to the fullest extent permitted by Law, each party hereto hereby waives any requirement for the securing or posting of any bond in connection with such remedy), this being in addition to any other remedy to each such party is entitled at law or in equity.

***[Remainder of Page Intentionally Left Blank; Signature Pages Follow]***

EAST\166026559.2
US_138623865v13_392525-00029 4/18/2019 4:07 PM

IN WITNESS WHEREOF, each of the parties hereto has caused this Asset Purchase Agreement to be executed by its duly authorized representative as of the day and year first above written.

SELLERS:

SIZMEK DSP, INC., a Delaware corporation, Debtor and Debtor-in-Possession

By: _____
Name: _____
Title: _____

X Plus Two Solutions, LLC, a Delaware limited liability company, Debtor and Debtor-in-Possession

By: _____
Name: _____
Title: _____

X Plus One Solutions, Inc., a Delaware corporation, Debtor and Debtor-in-Possession

By: _____
Name: _____
Title: _____

WirelessDeveloper,    Inc.,    a    Michigan corporation, Debtor and Debtor-in-Possession

By: _____
Name: _____
Title: _____

[Signature Page to Asset Purchase Agreement]

Wireless Artist LLC, a Michigan limited liability company, Debtor and Debtor-in-Possession

By: _____

Name: _____

Title: _____

PURCHASER:

ZETA GLOBAL HOLDINGS CORP.

By: _____

Name: ___Steven Vine_____

Title: ____EVP_____

[Signature Page to Asset Purchase Agreement]

**<u>Annex I</u>**
**DSP Direct Subsidiaries**

1.  Rocket Fuel Ltd (United Kingdom);

2.  Rocket Fuel Publicidade Ltda (Brazil);

3.  Rocket Fuel Czech Services s.r.o. (Czech Republic); and

4.  Rocket Science Media Inc. (Canada).

EAST\166026559.2
US_138623865v13_392525-00029 4/18/2019 4:07 PM

**<u>Annex II</u>**
**DSP Indirect Subsidiaries**

1.  Rocket Fuel GmbH (Germany);

2.  Rocket Fuel Italia (Italy);

3.  Rocket Fuel Nordics Filial (Sweden);

4.  Rocket Fuel Ltd. (France);

5.  Rocket Fuel Ltd Sucursal En Espana (Spain); and

6.  Rocket Fuel (Australia) Ltd (Australia).

EAST\166026559.2
US_138623865v13_392525-00029 4/18/2019 4:07 PM

## **Exhibit A**
**Sale Order**

See attached.

EAST\166026559.2
US_138623865v13_392525-00029 4/18/2019 4:07 PM

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| SIZMEK INC., *et al.,*[1] | ) | Case No. 19-10971 (SMB) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## ORDER AUTHORIZING AND APPROVING PRIVATE SALE OF THE DEMAND-SIDE PLATFORM AND THE DATA MANAGEMENT PLATFORM FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS, AND GRANTING RELATED RELIEF

Upon the motion (the "Sale Motion")[2] of the above-captioned debtors and debtors-in-possession (collectively, the "Debtors"), including Sizmek DSP, Inc.; X Plus Two Solutions, LLC; X Plus One Solutions, Inc.; Wireless Developer, Inc.; and Wireless Artist LLC (the "Sellers") for entry of an order (this "Order"), pursuant to Bankruptcy Code Sections 105, 363, 365 and Bankruptcy Rules 2002, 6004, 6006, and 9014, among other things:  (i) authorizing the sale of the Purchased Assets, free and clear of any claim, charge, lien (statutory or otherwise), mortgage, lease, hypothecation, encumbrance, pledge, security interest, option, rights of use, right of first offer, right of first refusal, easement, servitude, restrictive covenant, encroachment, license and other restriction and interest (the "Encumbrances") in any of the Purchased Assets, (ii) authorizing the Sellers to pay a break-up fee and expense reimbursement to the Buyer, under certain conditions set forth in the APA; (iii) authorizing procedures for the assumption and

---

[1]    Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:  Sizmek Inc. (4624); Sizmek DSP, Inc. (2319); Point Roll, Inc. (3173); Sizmek Technologies, Inc. (6402); Wireless Artist LLC (0302); Wireless Developer, Inc. (9686); X Plus One Solutions, Inc. (8106); and X Plus Two Solutions, LLC (4914).  The location of Debtors' service address for purposes of these chapter 11 cases is:  401 Park Avenue South, Fifth Floor, New York, NY 10016.

[2]    Capitalized terms used in this Order but not otherwise defined herein shall have the meanings ascribed to such terms in the Sale Motion or APA, as applicable.

assignment of certain of Sellers' executory contracts and unexpired leases in connection therewith and (iv) granting other related relief; and upon the FTI Declaration, the Company Declaration and the First Day Declaration; and it appearing that the relief requested is in the best interests of Sellers' estates, their creditors, their stakeholders and other parties-in-interest; and the Court having jurisdiction to consider the Sale Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334; and consideration of the Sale Motion and the relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and notice of the Sale Motion and opportunity for objections having been provided; and this Court having heard statements of counsel and the evidence presented in support of the relief requested by Sellers in the Sale Motion at a hearing before this Court (the "Sale Hearing"); and it appearing that no other notice need be given; and it further appearing that the legal and factual bases set forth in the Sale Motion and at the Sale Hearing establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor:

**IT IS HEREBY FOUND AND DETERMINED THAT:[3]**

## Jurisdiction, Final Order and Statutory Predicates

A.     This Court has jurisdiction to hear and determine the Sale Motion pursuant to 28 U.S.C. §§ 157(b)(a) and 1334(a).  This is a core proceeding pursuant to 28 U.S.C. §157(b)(2)(A), (N) and (O).  Venue is proper in this District and in this Court pursuant to 28 U.S.C. §§1408 and 1409.

---

[3]     The findings and conclusions set forth herein shall constitute this Court's findings of fact and conclusions of law as described in Bankruptcy Rule 7052, made applicable to this matter by Bankruptcy Rule 9014.

B.      This Order is a final and appealable order within the meaning of 28 U.S.C. § 158(a). Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), and to any extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rule 7054, this Court expressly finds that there is no reason to delay implementation of this Order.

C.      The predicates for the relief requested in the Sale Motion are Sections 105(a), 363(b), (f) and (m) and 365 of the Bankruptcy Code and Bankruptcy Rules 2002(a)(2), 6004(a), (b), (c), (e), (f) and (h) and 6006(a), (c) and (d), 9007 and 9014.

## Notice of the Sale Transaction

D.      As evidenced by the affidavits of service previously filed with this Court, proper, timely, adequate and sufficient notice of the Sale Hearing and the Sale Transaction has been provided in accordance with Sections 105(a), 363 and 365 and Bankruptcy Rules 2002, 6004, 6006 and 9014.[4]  The notices were good, sufficient and appropriate under the circumstances, provided all interested parties with timely and proper notice of the Sale Hearing and the Sale Transaction, and no further or other notice of the Sale Hearing and the Sale Transaction is required.

## Good Faith of the Buyer

E.      The Buyer is purchasing the Purchased Assets in good faith and is a good faith purchaser within the meaning of Section 363(m), and is therefore entitled to the full protection of that provision, and otherwise has proceeded in good faith in this proceeding in that, *inter alia*, the Buyer:  (i) is not related in any way to the Sellers; (ii) recognized that Sellers were free to deal with any other party interested in acquiring the Purchased Assets; (iii) disclosed all payments it is to make and all agreements or arrangements related to the Sale Transaction; (iv) has not violated

---

[4] Unless otherwise provided, "Section" references are to the Bankruptcy Code.

Section 363(n) by any act or omission; and (v) negotiated and executed the APA at arms' length and in good faith.

F.      In the absence of a stay pending appeal, the Buyer will be acting in good faith pursuant to Section 363(m) in closing the transaction contemplated by the APA, at any time on or after entry of this Order in accordance with the APA.

## Highest and Best Offer

G.      The transaction contemplated by APA constitutes the highest and best offer for the Purchased Assets, and will provide a greater recovery for Sellers' estates than would be provided by any other available alternative.  Sellers' determination that the APA constitutes the highest and/or best offer constitutes a valid and sound exercise of Sellers' business judgment.

H.      The APA and its terms represents a fair and reasonable offer to purchase the Purchased Assets under the circumstances of these Chapter 11 Cases.  No other person or entity or group of entities has offered to purchase the Purchased Assets for greater value to Sellers' estates than the Buyer.

I.      Approval of the Sale Motion and the APA and the consummation of the transactions contemplated thereby are in the best interests of Sellers, their creditors, their estates and other parties in interest.

J.      The terms of the APA reflect Sellers' exercise of prudent business judgment consistent with their fiduciary duties.

## Bid Protections

K.      The Bid Protections, namely a break-up fee of $250,000 and expense reimbursement up to a maximum of $500,000 (together, the "Bid Protections"), are reasonable in relation to the size of the proposed Sale and under the facts and circumstances of the Sale

-4-

Transaction.  The Sellers have articulated good and sufficient business reasons for the Court to approve the Bid Protections.

**No Fraudulent Transfer**

L.       None of Sellers or the Buyer has entered into the APA or proposes consummating the Sale Transaction, for the purpose of hindering, delaying or defrauding Sellers' present or future creditors.  None of Sellers or the Buyer has entered into the APA or proposes consummating the Sale Transaction in violation of fraudulent conveyance and fraudulent transfer laws whether under the Bankruptcy Code or any other applicable law.

M.       The consideration to be provided by the Buyer pursuant to the APA is fair and adequate and constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code and under other applicable law.

N.       The Buyer is not a successor to Sellers or their estates and the Sale does not amount to a consolidation, merger or de facto merger of the Buyer and Sellers.

**Validity of Transfer**

O.       Sellers are hereby authorized to enter into and perform their obligations under the APA; to execute and perform such agreements or documents; and to take such other actions as are necessary or desirable to effectuate the APA.

**Section 363(f) is Satisfied**

P.       The Debtors' secured lenders (Cerberus and Sizmek Finco, LLC) have consented to the sale of the Purchased Assets to the Buyer on the terms set forth in the APA.  Accordingly, the conditions for a sale of the Purchased Assets to the Buyer free and clear of all Encumbrances pursuant to Section 363(f) have been satisfied.

Q.      The Buyer shall have no obligations with respect to any liabilities of Sellers other than the Assumed Liabilities specifically set forth in and solely to the extent provided pursuant to the APA.

### Compelling Circumstances for an Immediate Sale

R.      To maximize the value of the Purchased Assets and preserve the viability of the businesses to which the Purchased Assets relate, it is essential that the Sale Transaction occur within the time provided in the APA.  Time is of the essence in closing the Sale Transaction.

S.      Given the circumstances of these Chapter 11 Cases and the adequacy of the purchase price under the APA, the proposed Sale Transaction on the terms and conditions set forth in the APA is a reasonable exercise of Sellers' business judgment and should be approved.

T.      The consummation of the transaction is legal, valid and properly authorized under all applicable provisions of the Bankruptcy Code, including, without limitation, Sections 105(a), 363(b), 363(f), 363(m), 365(b) and 365(f) and all applicable requirements of such Sections have been complied with in respect of the transaction.

### NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED:

### General Provisions

1.      The Sale Motion is granted as set forth in this Order.  All objections to the Sale Motion that have not been withdrawn, waived or settled as announced to this Court at the Sale Hearing or by stipulation filed with this Court, and all reservations of rights included therein, are overruled on the merits.

**Approval of the APA**

2.      The APA, attached as <u>Exhibit 1</u>, and all other ancillary documents, and all of the terms and conditions thereof, are approved.

3.      Pursuant to Section 363(b), Sellers are authorized to take any and all actions necessary or appropriate to (a) consummate the Sale Transaction with the Buyer upon the terms and conditions of the APA, (b) close the Sale Transaction upon the terms and conditions of the APA and this Order, and (c) execute, deliver, perform, consummate, implement and close the APA, together with all additional instruments and documents that may be reasonably necessary or appropriate to implement the APA, provided that such additional instruments and documents do not materially change the terms of the APA.

4.      The Bid Protections are approved.  The Sellers are authorized to pay the Bid Protections in accordance with the APA.

5.      This Order and the APA shall inure to the benefit of Sellers, their estates and creditors and the Buyer, and their respective successors and assigns.

**Transfer of the Purchased Assets**

6.      Pursuant to Sections 105(a), 363(b), 363(f), 365 and 365(f), Sellers are authorized and directed to transfer the Purchased Assets on the Closing Date.  Such assets shall be transferred to the Buyer upon the terms and conditions of the APA upon and as of the Closing and such transfer shall constitute a legal, valid, binding and effective transfer of the Purchased Assets free and clear of all Encumbrances except for any Permitted Liens and Assumed Liabilities.  Upon the Closing, the Buyer shall take title to and possession of the Purchased Assets subject only to any Permitted Liens.  Pursuant to Section 363(f), the transfer of title to the Purchased Assets shall be free and clear of any and all Encumbrances except for Assumed Liabilities and Permitted Liens.

138548939_392525-00001

All Encumbrances on the Purchased Assets other than Permitted Liens shall attach solely to the proceeds of the Sale Transaction with the same validity, priority, force and effect that they now have as against the Purchased Assets, subject to any and all claims and defenses Sellers and their estates have.

7.      Except as expressly permitted or otherwise specifically provided in the APA or this Order, all persons or entities holding Encumbrances in all or any portion of the Purchased Assets (other than Permitted Liens and Assumed Liabilities) arising under or from, or in any way relating to Sellers, the Purchased Assets, the operation of Debtors' business prior to the Closing or the transfer of the Purchased Assets to the Buyer, are forever barred, estopped and permanently enjoined from asserting against the Buyer or its successors or assigns, their property such persons' or entities' Encumbrances in and to the Purchased Assets. Effective as of the Closing, each creditor is authorized and directed to execute such documents and take all other actions as may be necessary to release any Encumbrances (except for the Permitted Liens) on the Purchased Assets, as provided herein, that may have been recorded or may otherwise exist. The transactions authorized herein shall be of full force and effect, regardless of any Sellers' lack of good standing in any jurisdiction in which such Debtor is formed or authorized to transact business. Upon consummation of the transactions set forth in the APA, the Buyer shall be authorized to file termination statements or lien terminations in any required jurisdiction to remove any record, notice filing, or financing statement recorded to attach, perfect or otherwise notice any lien or encumbrance with respect to the Purchased Assets (but not the proceeds thereof) that is extinguished or otherwise released pursuant to this Order under Section 363 and any related provisions.

8.      All persons and entities are forever prohibited and enjoined from taking any action that would adversely affect or interfere with the ability of Sellers to sell and transfer the

Purchased Assets to the Buyer in accordance with the APA and this Order to the fullest extent provided by Section 363.

9.      All persons and entities that are in possession of some or all of the Purchased Assets on the Closing Date are directed to surrender possession of such Purchased Assets to the Buyer or the Buyer Designee at the Closing.

10.      The provisions of this Order authorizing the Sale Transaction by Sellers free and clear of Encumbrances shall be self-executing, and none of Sellers, the Buyer or any other party shall be required to execute or file releases, termination statements, assignments, cancellations, consents or other instruments to effectuate, consummate, and/or implement the provisions hereof with respect to the Sale; provided, however, that this paragraph shall not excuse such parties from performing any and all of their respective obligations under the APA or as otherwise set forth in this Order or requested by Buyer.

11.      Without limiting the foregoing, a certified copy of this Order may be filed with the appropriate clerk or recorded to act to cancel any of the Encumbrances on the Purchased Assets of record except the Permitted Liens.

12.      If any person or entity that has filed statements or other documents or agreements evidencing Encumbrances on all or a portion of the Purchased Assets shall not have delivered to Sellers prior to the Closing, in proper form for filing and executed by appropriate parties, termination statements, instruments of satisfaction, releases of liens and easements, and any other documents necessary or desirable to the Buyer for the purpose of documenting the release of all Encumbrances on the Purchased Assets, which the person or entity has or may assert with respect to all or any portion of the Purchased Assets, Sellers are hereby authorized and directed, and the Buyer is hereby authorized, to execute and file such statements, instruments,

releases and other documents on behalf of such person or entity with respect to the Purchased Assets.

13.     This Order is binding upon all persons and entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal and local officials and all other persons or entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any lease; and each of the foregoing persons and entities is hereby directed to accept for filing any and all of  the documents and instruments necessary and appropriate to consummate the transactions contemplated by the APA; provided that nothing herein shall relieve any entity of the obligation to pay filing fees required to be paid under non-bankruptcy law.

14.     Any and all governmental recording offices and all other parties, persons or entities are authorized to accept this Order for recordation on or after the Closing as conclusive evidence of the free and clear, and unencumbered, transfer of all right, title, interest and ownership in and to the Purchased Assets conveyed to the Buyer at Closing.

### Payment to Cerberus is Appropriate

15.     In connection with the closing of the Sale Transaction, the Buyer is authorized and directed to pay directly (the "Direct Cerberus Payments") to Cerberus Business Finance, LLC ("Cerberus"), as administrative agent and collateral agent for certain revolver and term loan lenders (the "Senior Lenders" and, together with Cerberus, the "Secured Parties") under that certain Financing Agreement, dated as of September 6, 2017 (as subsequently amended from time to time, the "Financing Agreement"), all amounts that are payable by the Buyer at closing

-10-

(whether in the form of cash or otherwise) and fifty percent (50%) of the Subsequent Payments, namely all amounts that may subsequently become payable by the Buyer under the APA or under any related documents.  Cerberus is authorized to apply the Direct Cerberus Payments to satisfy amounts owed to the Secured Parties under the Financing Agreement in accordance with the terms and conditions thereof.  The authority for Cerberus to receive and apply the Direct Cerberus Payments under this Order will not restrict the relief that might be sought by any party in interest against the Secured Parties pursuant to the terms and conditions of the *Interim Order (I) Authorizing the Debtors to Use Cash Collateral Pursuant to 11 U.S.C. § 363, and (II) Granting Adequate Protection Pursuant to 11 U.S.C. §§ 361, 362, 363, and 507, and Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001(b)* [Dkt. 37] or any successor order thereto, as to which possible relief the rights of all parties (including the Secured Parties) are fully reserved.

## **Procedure for Assignment and Assumption of Assigned Contracts**

16.     The Cure Notice substantially in the form attached to the Sale Order as Exhibit 2 is hereby approved.

17.     A hearing to consider approval of the Assumption and Assignment Order shall be scheduled for at a hearing on May 6, 2019, or such other date as is scheduled by the Court.

## **Other Provisions**

18.     In connection with the sale of the Purchased Assets, Debtors shall be required to abide by their privacy policies in place as of the date of the APA, as such policies may be amended from time to time.  Accordingly, no consumer privacy ombudsman will be appointed in connection with the sale under Section 363(b)(1).

19.     The Buyer is not and shall not be deemed a successor to the Sellers as a result of the consummation of the Sale Transaction.  The Buyer has given substantial consideration

-11-

under the APA for the benefit of the Sellers, their estates and the holders of any Encumbrances. The consideration given by the Buyer is valid and valuable consideration for the releases of any potential claims of successor or transferee liability against the Buyer, which releases shall be deemed to have been given in favor of the Buyer by all holders of Encumbrances against any of the Sellers or any of the Purchased Assets.

20.    Effective upon the Closing of the Sale Transaction: (a) all holders of Encumbrances are hereby barred and permanently enjoined from in any way asserting or pursuing such Encumbrances against the Buyer, the Buyer's successors or assigns and/or the Purchased Assets; (b) all holders of Encumbrances are hereby barred and permanently enjoined from in any way asserting or pursuing any action against the Buyer, the Buyer's successors or assigns and/or the Purchased Assets based on any theory of successor or transferee liability; and (c) no holder of any Encumbrance shall in any way interfere with the Buyer's possession of, title to, or use and enjoyment of the Purchased Assets.

21.    Notwithstanding any provision of this Order, the APA, other documents, or otherwise, all rights, claims, defenses, causes of action (including Avoidance Actions) and rights of offset or counterclaim of Sellers against Buyer, Buyer Designee, or their respective Affiliates, are expressly retained by Sellers.

22.    The Buyer has acted in good faith and has not colluded in undertaking the Sale Transaction.  The Buyer is entitled to all of the protections afforded by Section 363(m), and the Sale Transaction may not be avoided, nor may any costs or damages be imposed, under Section 363(n).

23.    Nothing contained in any chapter 11 plan confirmed in any of Debtors' Chapter 11 Cases, any order confirming any such chapter 11 plan, any order approving wind-down

-12-

or dismissal of any of Debtors' Chapter 11 Cases or any subsequent chapter 7 cases, or any other order of any type or kind entered in Debtors' Chapter 11 Cases shall conflict with or derogate from the provisions of the APA or the terms of this Order, and to the extent of any conflict or derogation between this Order or the APA and such future plan or order, the terms of this Order and the APA shall control.

24.     Pursuant to Bankruptcy Rules 7062, 9014, 6004(h), and 6006(d), this Order shall be effective immediately upon entry and Sellers and Buyer are authorized to close the Sale Transaction immediately upon entry of this Order.

25.     No bulk sales or similar law of any state or jurisdiction applies to the Sale.

26.     Except for FTICA, there are no brokers involved in consummating the Sale Transaction and no brokers' commissions are due.

27.     The failure to identify any particular provision of the APA in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of this Court that the APA be authorized and approved in its entirety.

28.     The APA and any related agreements or other instruments (other than this Order) may be modified, amended or supplemented by the parties thereto and in accordance with the terms thereof, without further order of this Court, provided that any such modification, amendment or supplement does not have a material adverse effect on Sellers' estates.

29.     The terms of this Order shall govern any inconsistencies between the terms of this Order and the APA.

30.     All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

138548939_392525-00001

31.    This Court shall retain jurisdiction to, among other things, interpret, implement and enforce the terms of the Order and the APA, all amendments thereto and any waivers and consents thereunder and each of the agreements executed in connection therewith to which Sellers are a party or which had been assigned by Sellers to the Buyer, and to adjudicate, if necessary, any and all disputes relating in any way to the Sale Transaction.

Dated: _____, 2019
New York, New York

_____
THE HONORABLE STUART M. BERNSTEIN
UNITED STATES BANKRUPTCY JUDGE

**<u>Exhibit 1 to the Sale Order</u>**

**Asset Purchase Agreement**

## **Exhibit 2 to the Sale Order**

### **Assigned Contracts and Cure Amounts[1]**

---

[1]    As contemplated in the Motion and proposed Order, the list of Assumed Contracts and Cure Costs will be filed at a later date.

## Exhibit 2 to the Sale Order

## Assigned Contracts and Cure Amounts[1]

---

[1] As contemplated in the Motion and proposed Order, the list of Assumed Contracts and Cure Costs will be filed at a later date.