**Hearing Date: April 29, 2019 at 11:00 a.m. (prevailing Eastern Time)**
**Objection Deadline: April 26, 2019 at 4:00 p.m. (prevailing Eastern Time)**

Thomas E. Patterson (*pro hac vice*)
Whitman L. Holt (*pro hac vice*)
Ariella T. Simonds (*pro hac vice*)
KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 Avenue of the Stars, 39th Floor
Los Angeles, CA 90067
Telephone: (310) 407-4000
Facsimile:  (310) 407-9090

*Counsel to Cerberus Business Finance, LLC*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| SIZMEK INC., *et al.*,[1] | Case No. 19-10971 (SMB) |
| Debtors. | (Jointly Administered) |
| | **Re: Docket Nos. 78, 83** |

**STATEMENT OF CERBERUS BUSINESS FINANCE, LLC REGARDING DEBTORS'
MOTION FOR AN ORDER AUTHORIZING AND APPROVING A PRIVATE SALE OF
THE DEMAND SIDE PLATFORM AND THE DATA MANAGEMENT PLATFORM
FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND OTHER
INTERESTS, AND GRANTING RELATED RELIEF**

Cerberus Business Finance, LLC ("Cerberus"), as administrative agent and collateral agent for certain revolver and term loan lenders that are secured by first-priority liens on substantially all of the Debtors' assets, submits this statement regarding the *Debtors' Motion for an Order Authorizing and Approving a Private Sale of the Demand Side Platform and the Data Management*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:  Sizmek Inc. (4624); Point Roll, Inc. (3173); Sizmek DSP, Inc. (2319); Sizmek Technologies, Inc. (6402); Wireless Artist LLC (0302); WirelessDeveloper, Inc. (9686); X Plus One Solutions, Inc. (8106); and X Plus Two Solutions, LLC (4914).

*Platform Free and Clear of All Liens, Claims, Encumbrances, and other Interests, and Granting Related Relief* [Docket No. 78] (the "Sale Motion").[2] In support hereof, Cerberus respectfully states as follows:

1. These cases were commenced as a result of a liquidity shortage caused by the failure of the Debtors' equity sponsor to provide the Debtors with the second half of a $30 million second-lien loan agreed to as part of a restructuring in August 2018. First Day Decl. ¶ 19. The second $15 million was due before January 31, 2019. *Id.* The sponsor's decision not to fund the second half of its loan commitment followed a precipitous decline in the Debtors' revenues from $399 million in the Debtors' 2016 fiscal year to $289 million in the 2017 fiscal year, and, by the first quarter of 2019, a projected $170 million in annual revenues. *Id.* ¶ 18. Faced with the sponsor's failure to fund and projections that showed ongoing operating losses, Cerberus also declined to extend additional financing, and began to take steps to collect its nearly $160 million first-lien debt. *Id.* ¶ 3. As conceded by the Debtors, Cerberus has a first priority perfected security interest in, *inter alia*, the Debtors' accounts receivable. Cash Collateral Order ¶ D.

2. Cerberus was skeptical that the Debtors' proposed sale of their media business would generate sufficient value to protect the Secured Parties' interests in those assets because the purchase price is lower than the face amount of the outstanding receivables associated with the media business. The accounts receivable exceed $30 million, and the purchase price is comprised of $10 million in cash, $5 million in preferred stock, and contingent payments equal to a 50% share of the net accounts receivable, subject to reduction if the amount of the accounts receivable falls

---

[2] The Debtors attached a draft sale agreement as Exhibit 1 to the proposed order granting the Sale Motion (the "Sale Order") but, thereafter, replaced Exhibit 1 to the Sale Order with a revised sale agreement (the "Asset Purchase Agreement") pursuant to a notice docketed at Docket No. 83. Capitalized terms used but not otherwise defined herein have the meanings ascribed to such terms in the Sale Motion or the Asset Purchase Agreement, as applicable.

below $30 million.  Asset Purchase Agreement §§ 3.1, 3.3.  Following discussions with the Debtors and their advisors, Cerberus agreed to forgo simply collecting out the receivables and to support the sale, with the attendant benefits of saving many of the jobs associated with the business and reducing the disruption to the Debtors' customers, on the specific terms set forth in the Asset Purchase Agreement and proposed Sale Order, including receipt of the cash, the preferred stock and one-half of the estates' share of the contingent payments for application to the Debtors' outstanding first-lien secured debt.[3]  The remaining one-half of the contingent payments would be available for use by the Debtors pursuant to the terms of a cash collateral arrangement and an approved budget.  These terms were heavily negotiated and, without them, the sale would not adequately protect the Secured Parties' property interests and Cerberus would not consent to it.

3.     Adequate protection is required for most secured creditors in connection with a sale of estate assets free and clear of existing liens.  *See, e.g.*, S. Rep. No. 989, 95th Cong., 2d Sess. 56 (1978), *reprinted in* 1978 U.S. Code Cong. & Admin. News 5787, 5842 (committee report on 11 U.S.C. § 363(f)) ("Sale under this subsection is subject to the adequate protection requirement.  Most often, adequate protection in connection with a sale free and clear of other interests will be to have those interests attach to the proceeds of the sale.") (cited in *MacArthur Co. v. Johns-Manville Corp.*, 837 F.2d 89, 94 (2d Cir. 1988)).  Under the circumstances of these Chapter 11 Cases, the distinction between granting a replacement security interest in sale proceeds and permitting a purchaser to pay such proceeds directly to the secured creditor, as the Debtors have proposed here, is largely a difference of timing and risk.  The proceeds from a sale of the media business would be used to partially satisfy the Secured Parties' claims in any event.  Here, the

---

[3] Cerberus also agreed that the $600,000 minimum fee in favor of the Debtors' investment bankers, FTICA, would be deducted from the $10 million payment before it is paid to Cerberus.

3

Debtors have agreed that making some of that payment now rather than at the end of the cases, in exchange for Cerberus's consent to the sale, is in the best interests of their estates and otherwise appropriate.[4]  This is not the first time chapter 11 debtors have reached such a conclusion. *See, e.g.*, *In re Daily Gazette Co.*, 584 B.R. 540 (Bankr. S.D.W. Va. 2018) (granting debtors' request to authorize disbursement of a partial portion of section 363 asset-sale proceeds to a secured creditor, including because "as is often the case in bankruptcy, . . . all of the major assets are secured by liens in favor of one creditor" and there was "no strong justification" for holding 100% of "the sale proceeds in reserve for later distribution").

4. In connection with the Motion, the Debtors and their advisors have evaluated the Debtors' cash needs and determined that they will not require use of the sale consideration that they propose to have paid directly to Cerberus.  Mot. ¶ 41.  Indeed, as the Debtors explain in the Sale Motion, the sale is not driven by a need for cash to fund the continued operation of the Debtors' other business segments or the administration of their estates; the Debtors and their advisors believe that the capital generated from their other businesses and the 50% of the Subsequent Payments that will be directed to the estates will be sufficient to cover these costs. *Id.* Instead, the forces driving the sale and its timing are the purchaser's insistence on a closing prior to April 30, 2019, and the Debtors' views that (i) the revenue generated by the media business cannot justify its high costs without a significantly larger market share, (ii) the value of the media business is rapidly declining, and (iii) its value is likely to experience a further and precipitous decline in the near future.  Wittler Decl. ¶¶ 8-9; Tobias Decl. ¶¶ 18-19; First Day Decl. ¶ 15.  In light of these factors, the Debtors have reasonably determined that the interests of their estates are

---

[4] The Debtors have explained the reasons for this conclusion in the Motion, the First Day Declaration, and the supporting declarations of Sascha Wittler and Glenn Tobias [Docket Nos. 79 and 80] (the "Wittler Declaration" and the "Tobias Declaration," respectively).

best served by capturing the value of the media business now and applying some of that value to reduce significant senior secured claims. Without any need of the funds for the estates, there is no reason to delay distributing the excess proceeds of the sale to Cerberus in partial satisfaction of the Secured Parties' claims.

5. The distribution of the sale consideration is also appropriate because the consummation of the sale will eliminate both the ongoing costs of operating the media business (and hence any further need for the cash proceeds for operations) and the prospect of future accounts receivable generated by this business. Normally, a secured creditor consents to the estate's use of the proceeds of accounts receivable because the estate will use the cash to generate ongoing accounts receivable that, on an aggregate basis, leave the secured creditor adequately protected. Obviously this business will not generate future accounts for the estates once it is sold. Despite this, the proposed arrangement between Cerberus and the estates contemplates that the Debtors will receive half of the estates' share of the accounts receivable recovered by the purchaser, an arrangement that is more than reasonable given the Secured Parties' property interests in all of these funds and the absence of any need by the estates to operate the disposed business.

6. There is no harm to the estates in directing a portion of the sale consideration to Cerberus because, under the terms of the proposed Sale Order, Cerberus's receipt of funds is provisional only, subject to turnover if it is later determined following a meritorious "challenge" that the Secured Parties were not entitled to such amounts. Specifically, the Sale Order provides that nothing in that order will "restrict the relief that might be sought by any party in interest against the Secured Parties pursuant to the terms and conditions of the [Cash Collateral Order], as to which possible relief the rights of all parties (including the Secured Parties) are fully reserved." Sale

Mot., Ex. 1 ¶ 15. To be clear, Cerberus does not believe there is any basis whatsoever to "challenge" the Secured Parties' liens and claims regarding the assets now proposed to be sold. Nevertheless, in light of the fact that the proposed Sale Order preserves the potential for turnover of any sale proceeds paid to Cerberus or for any other appropriate relief, the payment of such proceeds directly to Cerberus will not even theoretically harm the estates in any way and will benefit the estates by securing Cerberus's consent to the proposed sale.

## CONCLUSION

For all the foregoing reasons, and with the qualifications noted above, Cerberus supports the Debtors' Sale Motion. Accordingly, Cerberus respectfully urges the Court to grant the Sale Motion and approve the transactions described therein on the terms and conditions specified in the Asset Purchase Agreement and the Sale Order.

| | |
|---|---|
| Dated: April 25, 2019 | */s/ Whitman L. Holt* <br> Thomas E. Patterson (*pro hac vice*) <br> Whitman L. Holt (*pro hac vice*) <br> Ariella T. Simonds (*pro hac vice*) <br> KLEE, TUCHIN, BOGDANOFF & STERN LLP <br> 1999 Avenue of the Stars, 39th Floor <br> Los Angeles, CA 90067 <br> Telephone:   (310) 407-4000 <br> Facsimile:   (310) 407-9090 <br><br> *Counsel to Cerberus Business Finance, LLC* |